290 S.E.2d 5

**Christine E. HUGHES**

v.

**Philip GWINN, Warden, W. Va. Penitentiary for Women at Pence Springs.**

No. 15060.

Supreme Court of Appeals of West Virginia.

March 17, 1981.

Miller, J., filed an opinion concurring in the result in which Harshbarger, C. J., joined.

McGraw, J., filed a dissenting statement.

Don R. Sensabaugh, Jr., Kay, Casto & Chaney, Charleston, for petitioner.

Chauncey H. Browning, Atty. Gen., Richard S. Glaser, Jr., Asst. Atty. Gen., Charleston, for respondent.

NEELY, Justice:

In this original habeas corpus we are asked to determine the scope of a probationer's constitutional rights before a probation revocation proceeding has been initiated. Specifically, we are asked to consider: (1) when the right to counsel attaches; (2) whether there is the right to be advised of constitutional rights pursuant to the mandate of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and, (3) the degree of protection afforded probationers from unreasonable searches and seizures.

Christine E. Hughes pled guilty to the offense of passing a forged instrument in the Circuit Court of Kanawha County in December, 1978. On 5 February 1979 she received a suspended sentence and was placed on probation for a period of five years. On 20 June 1979, petitioner was arrested for the crime of forgery. On 1 October 1979 a capias for probation violation was issued for her and she was subsequently incarcerated in the Kanawha County Jail. On or about 2 October 1979 petitioner's probation officer brought twenty-two pieces of petitioner's mail, part of which had already been opened, to petitioner at the Kanawha County Jail. In the absence of counsel, and without informing petitioner that the subsequent conversation could be used against her in a probation revocation hearing, the probation officer proceeded to discuss the contents of the mail. Among the various pieces of mail were numerous notices from petitioner's bank informing her of insufficient funds for the checks she had written. According to the testimony of the probation officer, petitioner admitted that she had written the checks knowing that she had insufficient funds.

Petitioner was released on bond from the County Jail on 5 October 1979 and on 15 October 1979 she received a copy of the formal charges for violation of probation. On 2 January 1980 there were discussions between petitioner and the probation officer, again without counsel present and without petitioner being advised of her constitutional rights. Subsequently, the probation officer's testimony concerning conversations had with petitioner that occurred after the incarceration of petitioner were introduced at the final probation revocation hearing, over objection of petitioner's attorney. On 29 January 1980 petitioner's probation was revoked and the Court ordered a sentence of not less than one year nor more than ten years for the offense of passing a forged instrument.

As we recognized in *Sigman v. Whyte,* 165 W.Va. 356, 268 S.E.2d 603 (1980), probationers do not enjoy the same rights enjoyed by defendants before conviction. Thus, any discussion of probation must begin with obligatory homage to the underly-

ing principle of the probation system, namely that it "is an act of grace upon the part of the State to a person who has been convicted of a crime." Syl. pt. 2, *State ex rel. Strickland v. Melton*, 152 W.Va. 500, 165 S.E.2d 90 (1968).[1]

## I

■ Petitioner contends that her probation revocation is constitutionally infirm because she was not provided counsel during meetings with her probation officer which occurred after her incarceration. While a criminal defendant "is entitled to counsel at all critical stages of the proceeding against him," *State ex rel. Partain v. Oakley*, 159 W.Va. 805, 227 S.E.2d 314 (1976), a probationer's right to counsel has been limited to "any *proceeding* at which his probation is revoked." *State ex rel. Strickland v. Melton*, 152 W.Va. 500, 509, 165 S.E.2d 90, 96 (1968) (emphasis supplied). As petitioner's own research revealed, and ours confirms, no jurisdiction has established a probationer's right to counsel in advance of a formal hearing.[2]

Our Court has extended the right to counsel at a number of additional stages beyond simply the actual trial of a criminal case. *State ex rel. Partain v. Oakley*, 159 W.Va. 805, 227 S.E.2d 314, 321 (1976). While the United States Supreme Court has established a qualified right to counsel at probation revocation hearings, *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), we have held that counsel is required at every probation revocation hearing, and at each hearing at which

probation conditions are modified. *Louk v. Haynes*, 159 W.Va. 482, 223 S.E.2d 780 (1976). We have been leaders in protecting the rights of probationers, but we do not find that a probationer's right to counsel extends beyond formal proceedings. Right to counsel becomes essential when the probationer must depend on skills he is unlikely to possess, such as where the presentation of a defense requires the examination or cross-examination of witnesses. *Gagnon v. Scarpelli*, 411 U.S. 778, 786–87, 93 S.Ct. 1756, 1761–62, 36 L.Ed.2d 656 (1973). Following that analysis, we have held that a youthful offender is entitled to counsel at a hearing to consider transfer from a forestry center and re-sentencing to a penitentiary precisely because "the defendant will be confronted by a government prosecutor." *Watson v. Whyte*, 162 W.Va. 26, 245 S.E.2d 916 (1978).

We do not perceive a similar adversarial relationship between a probationer and a probation officer. Indeed, we agree with the United States Supreme Court's interpretation of the role of a probation officer, i.e., as an advocate for the probationer who recognizes his double duty to the welfare of his clients and to the safety of the general community, but whose "concern for the client dominates his professional attitude." *Gagnon v. Scarpelli*, 411 U.S. 778, 783–84, 93 S.Ct. 1756, 1760, 36 L.Ed.2d 656 (1973). The probation system is designed to promote rehabilitation and the imposition of counsel into the delicate relationship between probationer and his probation officer would clearly destroy that

---

1. In continuing to characterize probation as an "act of grace",we are not suggesting that further analysis of the probationer's rights is unnecessary. *See State ex rel. Winter v. MacQueen*, 161 W.Va. 30, 239 S.E.2d 660 (1977) (Miller, J. concurring). Since we have been consistently solicitous of the rights of probationers, we find that whether probation is termed an "act of grace" or "conditional liberty," *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) to be a question of semantics and that the phrases simply express the concept that a probationer has limited rights.

2. The primary source of conflict among other jurisdictions has been whether the right to counsel attaches at a preliminary hearing or only at

the final revocation proceeding. *See, e.g. State v. Bryan*, 284 Md. 152, 395 A.2d 475 (1978) (right to counsel attaches when probationer appears in court); *State ex rel. Hawkins v. Gagnon*, 64 Wis.2d 394, 219 N.W.2d 252 (1974) (right to counsel does not attach at preliminary probation revocation hearing); *State v. White*, 169 Conn. 223, 363 A.2d 143, *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975) (right to counsel does not attach at preliminary probation revocation hearing); *People v. Andre*, 112 Cal.Rptr. 438, 37 Cal.App.3d 516 (1974), (right to counsel does not attach at initial summary proceeding); and, *Elkins v. State*, 147 Ga. App. 837, 250 S.E.2d 535 (1978) (right to counsel attaches on a case-by-case basis) *See*, Annot. 44 A.L.R.3d 306 (1972).

goal. Obviously, the relationship between the probation officer and his client is ambivalent at best because the probation officer is at once friend and foe; if the probation officer believes that the probationer has violated any of the conditions of his probation, "the probation officer may arrest him with or without an order or warrant." *W.Va.Code*, 62–12–10 [1955]. Our experience in these matters, however, while not totally unmixed, instructs us to conclude that most probation officers have a genuine concern for the rehabilitation of their clients and that frank and informal discussions, notwithstanding that such discussions may elicit incriminating information, probably serve the liberty interest of probationers as a class better than the adversary model urged by petitioner. This conclusion is inescapable since there is no middle ground between the social welfare model and the adversary model.

In addition to our adherence to the theory of the social welfare model, we are well aware of the significant mechanical problems that would be generated in imposing the adversary model throughout the probation system. If counsel is needed to protect the probationer from revealing his violations to the probation officer, counsel would need to be present at every meeting. Beyond the substantial financial cost to the State for maintaining such a system,[3] we do not believe it is the duty of the State to protect the probationer from self-incrimination exactly because the whole activity of "probation" is an act of grace. While the "act of grace" language inspires misgivings because similar characterizations (such as "privilege" versus "right") have been used historically to foreclose judicial redress for wrongs, in the area of probation we in effect infer that all probationers would contract with the sentencing judge

to waive certain constitutional rights in return for continued liberty. To hold that probationers have more limited rights than the unconvicted population at large is merely to make explicit a contract to waive certain rights which heretofore has been merely implicit. All constitutional rights can be knowingly and intelligently waived, *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) and acceptance of probation status is a knowing and intelligent acceptance of a social welfare model of relationships, one of which is with the probation officer, in place of the adversary model.

## II

■ Petitioner also contends that her confession to her probation officer to the offense of knowingly writing "bad" checks should be inadmissible because it was obtained in violation of the *Miranda* rule. Every other jurisdiction has uniformly held, for a variety of reasons, that statements taken by a probation officer without first giving *Miranda* rights to the probationer, are admissible in a probation revocation hearing. Annot., 77 A.L.R.3d 669 (1977); Note, "Probation Officer Interrogation of an In-Custody Probationer," 10 U.S. F.L.Rev. 441, 443–44 (1976).[4] We agree that a probation officer need not give in-custody probationers *Miranda* warnings prior to questioning the probationer because we do not perceive that continuation of an ongoing dialogue between probationer and probation officer, notwithstanding that it happens to be conducted in a jail, constitutes the police-dominated interrogation that *Miranda* warnings were designed to prevent. If upon every visit or contact with the probation officer the probationer is entitled to a warning, then the relation-

---

3. In *Gagnon, supra,* the United States Supreme Court stated that the automatic requirement of counsel would be an unnecessary financial burden on the State and that it would destroy the informality of the probation revocation proceeding. Indeed the Court contended that, "the presence and participation of counsel will probably be both undesirable and constitutionally unnecessary in most revocation proceedings." 411 U.S. at 790, 93 S.Ct. at 1763. *But see* syl. pt.

2 *Dobbs v. Wallace,* 157 W.Va. 405, 412–14, 201 S.E.2d 914, 918–19 (1974).

4. A few states have held that statements obtained by police officers without first giving the *Miranda* warning are inadmissible in probation revocation proceedings. *In Interest of McMillan,* 51 Ill.App.3d 940, 10 Ill.Dec. 106, 367 N.E.2d 494 (1977); *State v. Smith,* 112 Ariz. 416, 542 P.2d 1115 (1975); and, *Jackson v. State,* 508 S.W.2d 89 (Tex.Cr.App.1974).

ship between the probation officer and the probationer would become strained and the objectives of education and rehabilitation would be materially affected.[5]

Furthermore, our analysis of the fundamental constitutional rights of a probationer is greatly influenced by the principle that we announced at the outset of our opinion: a probationer has limited freedom. The State has a substantial interest in monitoring the progress of a probationer, who is clearly a greater risk to society than the average citizen. Thus, the State must limit the freedom of the probationer in order to protect society. Here again we must return to the concept of a tacit contract where certain privacy rights are willingly waived when the defendant originally asked for probation. Certainly there is consideration on the part of the State for waiver on the part of the probationer. Application of *Miranda* warnings would seriously impede a probation officer's ability to determine whether a probationer should remain on the streets.[6] Thus we refuse to require *Miranda* warnings because a probation revocation hearing is not a criminal proceeding and, as the Fifth Circuit has concluded, "[a]n injection of the *Miranda* protection here could be toxic and produce a paresis in the probation process," *United States v. Johnson*, 455 F.2d 932, *cert. denied*, 409 U.S. 856, 93 S.Ct. 136, 34 L.Ed.2d 101 (1972).[7]

### III

■ Petitioner's final contention is that the seizure of her mail by her probation officer and the subsequent use of the contents against her constituted an illegal seizure under the Fourth Amendment to the United States *Constitution* and under Article III, Section 6 of the West Virginia *Constitution*. There is a dispute over whether the mail was opened by the probation officer or by the probationer's former roommate who gave the mail to the probation officer; however, that is immaterial since we believe that the probation officer had sufficient probable cause to search and seize petitioner's mail. A probationer does not absolutely forfeit protection from unreasonable searches and seizures merely by assuming the status of a probationer, but that status is a significant factor in the determination of probable cause.

■ The United States Supreme Court has said that the Fourth Amendment has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons and that when the public interest in presenting all the evidence which is relevant and probative is compelling, and the deterrent function served by exclusion is minimal, the exclusionary rule will not be invoked. *United States v. Janis*, 428 U.S. 433, 453–60, 96 S.Ct. 3021, 3031–3035, 49 L.Ed.2d 1046 (1976); and *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Under this test formulated by the Court for application of the exclusionary rule, the Fourth Amendment must tolerate probation officer search powers as part of the balance between the privacy rights of probationers and the specific supervisory needs of probation.[8] The Legis-

---

5. This reasoning was espoused in *People v. Ronald W.*, 24 N.Y.2d 732, 249 N.E.2d 882, 302 N.Y.S.2d 260 (1969) and *Nettles v. State*, 248 So.2d 259 (Fla.App.1972).

6. A summary analysis of eleven probation studies indicated that ten to forty per cent of all adult offenders released on probation are subsequently placed in prison. *The President's Commission on Law Enforcement and Administration of Justice Task Force Report: Corrections* Note 44, at 28 (1967).

7. While we do not require *Miranda* warnings by probation officers, we do not mean to suggest that a probationer's rights are vitiated and that *any* statement may be used against him. The

exclusionary rule of the Fifth Amendment privilege against self-incrimination is still applicable, thus an involuntary confession must be suppressed. *See People v. Peterson*, 74 Ill.2d 478, 23 Ill.Dec. 554, 384 N.E.2d 348 (1978). But *see State ex rel. Struzik v. Department of Health and Social Services*, 77 Wis.2d 216, 252 N.W.2d 660 (1977) and *Short v. United States*, 366 A.2d 781 (D.C.App.1976).

8. For in depth discussions of the balancing of privacy interests of probationers versus supervisory interests of probation officers *see* Note, "The Exclusionary Rule in Parole Revocation Hearings," 11 B.Y.U.L.Rev. (1979); Note, "The Exclusionary Rule and Probation Revocation

lature obviously intended probation officers to have a special and unique role in supervising probationers since they are empowered to arrest a probationer without a warrant, *W. Va. Code*, 62–12–10 [1955]; thus, it would frustrate the Legislature's intent if the probation officer's supervisory role were seriously impeded by the exclusionary rule.

■ We do not mean, however, that we will grant blanket privileges to probation officers to invade a probationer's privacy because we suspect that police officers may use probation officers to do what police officers are prohibited from doing under the exclusionary rule. Thus, for example, evidence uncovered by a probation officer's warrantless search that would be illegal under some, but not all, traditional Fourth Amendment standards would be admissible at a probation revocation hearing but would be suppressed in a subsequent criminal prosecution of the probationer. *United States ex rel. Sperling v. Fitzpatrick*, 426 F.2d 1161 (2d Cir. 1970). Furthermore, while the great majority of courts have held that the exclusionary rule is not applicable in probation revocation proceedings, Annot. 77 A.L.R.3d 636 (1977), we agree with those courts that have held that evidence must be suppressed if there is evidence of police harassment. *People v. Watson*, 69 Ill.App.3d 497, 26 Ill.Dec. 19, 387 N.E.2d 849 (1979); *Dulin v. State*, 169 Ind.App. 211, 346 N.E.2d 746 (1976); and, *United States v. Farmer*, 512 F.2d 160 (6th Cir.) *cert. denied*, 423 U.S. 987, 96 S.Ct. 397, 46 L.Ed.2d 305 (1975). Since we find no evidence of police harassment in this instance, the evidence is found to have been correctly admitted.

For the foregoing reasons the writ of habeas corpus is denied.

Writ denied.

MILLER, Justice, concurring:

While I concur in the result reached by the majority, I do not agree with the reasoning used to reach that result. The majority utilizes theories of "contractual waiver" and "social welfare model" that purportedly arise from the probationer's relationship to the State and society. The issues here involved are claims of illegally seized evidence and an invalid inculpatory statement. These issues are of constitutional dimensions and, in my view, cannot be properly disposed of on these theories.

The absurdity of a "contractual waiver" theory in this case is that the probationer signed no express waiver or consent to a warrantless search and seizure of her possessions. Under settled constitutional principles, a waiver of constitutional rights simply does not arise by implication but must be given in a voluntary, clear and unequivocal manner. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Even where an express waiver has been given by a parolee or probationer which subjects him to search and seizure at any time as a part of his release conditions, some courts have concluded that such a waiver is not voluntary because it is given in order to avoid further confinement or punishment. *E.g., United States ex rel. Coleman v. Smith*, 395 F.Supp. 1155 (W.D.N.Y.1975); *People v. Bremmer*, 30 Cal.App.3d 1058, 106 Cal. Rptr. 797 (1973); *People v. Peterson*, 62 Mich.App. 258, 233 N.W.2d 250 (1975); *Tamez v. State*, 534 S.W.2d 686 (Tex.Cr.App. 1976); 3 W. LaFave, *Search and Seizure* § 10.10(b) (1978).

The "social welfare model" theory is equally infirm since it rests on the tenuous premise that because rehabilitative goals are presumably being pursued in probation and parole there is no need to apply constitutional procedural safeguards to the "privacy rights" of the probationer or parolee. Certainly, the United States Supreme Court has rejected this concept in *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), and *Morrissey v. Brew-*

Proceedings" 11 Val.U.L.Rev. 149 (1976); Note, "Striking the Balance Between Privacy and Supervision," 51 N.Y.U.L.Rev. 800 (1976); Note, "The Exclusionary Rule in Probation and Parole

Revocation," 54 Tex.L.Rev. 1115 (1976); and, Cole, "The Exclusionary Rule," 52 Chi.Kent L.Rev. 21, 37–52 (1975).

er, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), by setting a number of procedural due process rights surrounding probation and parole revocation. This is the position that we have adopted in *Louk v. Haynes*, 159 W.Va. 482, 223 S.E.2d 780 (1976). *See State v. Cooper*, 167 W.Va. 322, 280 S.E.2d 95 (1981); *State v. Ketchum*, 169 W.Va. 9, 289 S.E.2d 657 (1981). Much the same argument—that pursuit of rehabilitative goals will warrant a reduction in constitutional safeguards—was rejected in *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Notwithstanding the rehabilitative nature of the juvenile process, the Supreme Court concluded that constitutional procedural due process rights applied to juvenile hearings.

A more acceptable method of determining the propriety of using illegally seized evidence in a probation revocation hearing is to begin with the recognition that because of the supervisory control exercised by the probation officer and the probationer's conditional freedom, there is a diminished expectation of privacy. Therefore, a warrantless visitation may be made to a probationer's home or apartment by his probation officer. *United States v. Workman*, 585 F.2d 1205 (4th Cir. 1978); *Latta v. Fitzharris*, 521 F.2d 246 (9th Cir. 1975); *In re Martinez*, 1 Cal.3d 641, 83 Cal.Rptr.

382, 463 P.2d 734 (1970), *cert. denied sub nom., Martinez v. Craven*, 400 U.S. 851, 91 S.Ct. 71, 27 L.Ed.2d 88; *cf. Wyman v. James*, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971). As *Workman* recognizes, once the probation officer is lawfully on the premises, he may act as any other law enforcement officer: [1]

"Thus he may search and seize articles as an incident to a lawful arrest. *Martin v. United States*, 183 F.2d 436 (4th Cir. 1950). Since his authority to visit places him lawfully in the probationer's home, he can seize contraband and instruments or evidence of crime in plain view. *Coolidge v. New Hampshire*, 403 U.S. 443, 464–73, 91 S.Ct. 2022, [2037–2042] 29 L.Ed.2d 564 [581–587] (1971). For his own safety, he can frisk the probationer without consent, and he can conduct a search with consent. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)." 585 F.2d at 1208.

The fact that the probation officer had a right to visit the probationer's apartment is all that is necessary to decide the search issue in the present case because there was technically no search by the probation officer [2] but a receipt by him of the probation-

---

**1.** It appears to be generally accepted that the right to conduct warrantless searches given to probation and parole officers under their administrative powers is not ordinarily extended to police officers who have no supervisory power over probationers or parolees. *See Latta v. Fitzharris*, 521 F.2d 246 (9th Cir. 1975); *United States v. Winsett*, 518 F.2d 51 (9th Cir. 1975); *United States v. Hallman*, 365 F.2d 289 (3d Cir. 1966); *State v. Sears*, 553 P.2d 907 (Alaska 1976); *State v. Shirley*, 117 Ariz. 105, 570 P.2d 1278 (App.1977); *People v. Coffman*, 2 Cal. App.3d 681, 82 Cal.Rptr. 782 (1969); *People v. Knight*, 75 Ill.2d 291, 26 Ill.Dec. 699, 388 N.E.2d 414 (1979); *State v. Davis*, 375 So.2d 69 (La. 1979); *State v. Nettles*, 287 Or. 131, 597 P.2d 1243 (1979); *State v. Proctor*, 16 Wash.App. 865, 559 P.2d 1363 (1977).

**2.** The majority speaks too broadly when they say "the great majority of courts have held that the exclusionary rule is not applicable in probation revocation proceedings, Annot. 77 A.L.R.3d 636 (1977)." (at p. 10, 1981) A reading of the cases in this field discloses that courts have been greatly troubled over this question. The

leading case, *Latta v. Fitzharris*, 521 F.2d 246 (9th Cir. 1975), was decided by a sharply divided court with the majority concluding that "[t]his is not to say that we will uphold every search by a parole officer. In a given case, what is done may be so unreasonable as to require that the search be held to violate the Fourth Amendment." 521 F.2d at 252. The Fourth Circuit has held that a warrant is required in the absence of plain view or some exigent circumstance. *United States v. Workman*, 585 F.2d 1205 (4th Cir. 1978). As a matter of fact, I am aware of no court which has adopted an absolute *per se* rule that the exclusionary rule will never apply. *See State v. Sears*, 553 P.2d 907, 914 (Alaska 1976) ("We can conceive of circumstances which would lead to the application of the exclusionary rule to revocation of probation proceedings."); *Harris v. State*, 606 S.W.2d 93, 95 (Ark.App.1980) ("[T]he trial court may permit the introduction of ... evidence that might be subject to a motion to suppress under the doctrine of *Mapp v. Ohio*, at least where there has been a good-faith effort to comply with the law."); *In re Martinez*, 1 Cal.3d 641, 647 n. 6, 83 Cal.Rptr. 382, 386 n. 6, 463 P.2d

er's mail voluntarily turned over to him by her roommate. There is no suggestion in the record that the probation officer opened or read any of the mail although some of the mail had been opened by the probationer's roommate. The probation officer subsequently delivered the mail to the probationer, who opened it in his presence and discussed some of its contents. In the course of this discussion, she made certain inculpatory statements.[3]

Her inculpatory statements were introduced at the revocation hearing. The introduction of these inculpatory statements gives rise to the second issue: whether she should have been given *Miranda* warnings by the probation officer, since she was in jail custody. The basic design of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was to forestall the admission of confessions arising from "incommunicado interrogation of individuals in a police-dominated atmosphere." 384 U.S. at 445, 86 S.Ct. at 1612, 16 L.Ed.2d at

707. To accomplish this goal, the Court required that the accused be given a statement of his rights. Consent by the accused to waive these rights was then required before questioning could take place as a "protective device to dispel the compelling atmosphere of the interrogation." 384 U.S. at 465, 86 S.Ct. at 1623, 16 L.Ed.2d at 718.

Most courts have refused to make *Miranda* applicable to questioning by a probation or parole officer on the basis that there exists a supervisory relationship between the officer and the probationer or parolee—which should not be unduly constricted by imposing *Miranda* warnings each time questioning is undertaken. *E.g., Thompson v. State*, 356 So.2d 757 (Ala.Cr. App.1978); *People v. Coleman*, 13 Cal.3d 867, 120 Cal.Rptr. 384, 533 P.2d 1024 (1975); *State v. Lassai*, 366 So.2d 1389 (La.1978); *State v. Generoso*, 156 N.J.Super. 540, 384 A.2d 189 (1978); *Commonwealth v. Kates*, 452 Pa. 102, 305 A.2d 701 (1973); Annot., 77 A.L.R.3d 669 (1977).[4]

Other courts have stressed the routine, noncustodial nature of the probation inter-

---

734, 738 n. 6 (1970) ("A dimunition of Fourth Amendment protection, however, can be justified only to the extent actually necessitated by the legitimate demands of the operation of the parole process."); *Grubbs v. State*, 373 So.2d 905, 907 (Fla.1979) ("[A]n individual does not absolutely forfeit the protection of the fourth amendment ... merely by assuming the status of a probationer."); *Seim v. State*, 95 Nev. 89, 94, 590 P.2d 1152, 1155 (1979) ("To justify a warrantless search by a parole or probation officer, the officer must have reasonable grounds to believe that a violation of the parole or probation has occurred."); *State v. Bollinger*, 169 N.J.Super. 553, 564, 405 A.2d 432, 438 (1979) ("[T]hese searches should only be conducted by probation officers, at reasonable times and in a reasonable manner."); *State v. Gardner*, 95 N.M. 171, 619 P.2d 847, 850 (1980) ("The requirement to submit to a search must be 'reasonable' both under the Constitution, [*United States v.*] *Consuelo-Gonzalez*, [521 F.2d 259, (9th Cir. 1975) ] ... and under the statute, § 31–20–6(F) [N.M.S.A.1978]."); *Commonwealth v. Brown*, 240 Pa.Super. 190, 361 A.2d 846, 850 (1976) ("[O]nce the rationale that justifies informal treatment of parolees ceases, the parolee's Fourth Amendment rights must be given full consideration.").

3. The entire testimony on this issue was from the probation officer. The probationer elected not to testify at the revocation hearing:

"A Yes. I took twenty-two pieces of mail that I had received on September 29th from her former roommate, Rosanna Ferguson.

The mail had come—as explained by Miss Ferguson, had come to her residence and Christine was no longer living there and she said 'I didn't want to have any more contact with her,' and asked me if I could please give her that mail, and I said that I would.

"Q So you took that mail to the Kanawha County Jail?

"A Yes.

"Q Was it opened or unopened when you took it there?

"A The mail was partially opened. There were some things that Miss Ferguson had opened. She said to me that she had opened them because it was just too tempting not to. She said she had an idea about what they were. I took those to Chief Probation Officer, Benwood Stout, and he suggested I take them on over to Christine, who was in the jail at that time.

"Q What happened during this interview with Miss Hughes on October 7th, 1979?

"A I handed Miss Hughes the twenty-two pieces of mail and she opened them in front of me and we discussed the contents of them."

4. Several courts have recognized that interrogation by police officers as distinguished from probation or parole officers may require *Miranda* warnings since the former have no administrative supervision over probationers or parolees. Therefore, no official relationship exists that permits general interrogation by police officers as to the probationer's conduct. *E.g., State v. Smith*, 112 Ariz. 416, 542 P.2d 1115

view. *E.g., People v. Knight*, 75 Ill.2d 291, 26 Ill.Dec. 699, 388 N.E.2d 414 (1979); *State v. Generoso, supra. People v. W.*, 24 N.Y.2d 732, 249 N.E.2d 882, 302 N.Y. S.2d 260 (1969); Annot., 77 A.L.R.3d 669 (1977). It may also be acknowledged that *Miranda* has never been held to apply to all interrogations but only those that are of a custodial nature. *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

Several courts have also found that custodial interrogations which produce an inculpatory statement and form the basis of a probation revocation charge may not be admitted in the absence of an appropriate *Miranda* warning. *E.g., State v. Smith*, 112 Ariz. 416, 542 P.2d 1115 (1975); *In re McMillan*, 51 Ill.App.3d 940, 10 Ill.Dec. 106, 367 N.E.2d 494 (1977); *Jackson v. State*, 508 S.W.2d 89 (Tex.Cr.App.1974). Here, the probationer was in custody. From the record, it appears that the probation officer was not responsible for her detention. The probationer had apparently been lodged in jail on an alleged probation violation independent of the information that the probation officer later obtained from the discussion of the mail. As previously noted, the probation officer delivered this mail to her at the jail and according to him, "I handed Miss Hughes the twenty-two pieces of mail and she opened them in front of me and we discussed the contents of them." It was during the course of this proceeding that she made the inculpatory statements.

Had the record in this case demonstrated that the probationer was incarcerated and that the purpose of the interrogation was to elicit inculpatory statements that would support the charge for which she was incarcerated, I would then require the giving of *Miranda* warnings. While the majority admits in note 7 that an involuntary confession may be still suppressed at a probation revocation hearing, they do not illuminate

(1975); *People v. Knight*, 75 Ill.2d 291, 26 Ill. Dec. 699, 388 N.E.2d 414 (1979); *Jackson v.*

what is meant by the term "involuntary." Even prior to the *Miranda* decision, a confession that was the product of coercion, either psychological or physical, was involuntary and therefore inadmissible. *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *Chambers v. Florida*, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940); *State v. Fortner*, 150 W.Va. 571, 148 S.E.2d 669 (1966). *Miranda* placed a procedural barrier against custodial interrogations. Unless the waiver of the *Miranda* rights was obtained, the custodial interrogation was inadmissible although it might have been "voluntary" in the pre-*Miranda* sense. In my view any custodial interrogation by a probation or parole officer that is centered on eliciting from the probationer or parolee inculpatory statements regarding his parole or probation violations should be preceded by *Miranda* warnings.

Finally, *Miranda* rights relate not only to the Fifth Amendment right against self-incrimination but the Sixth Amendment right to have counsel present before custodial interrogation can commence. *State v. Clawson*, 165 W.Va. 588, 270 S.E.2d 659, 665–66 (1980). The majority treats the right to counsel at a probation revocation hearing as a general proposition and ignores the right to counsel at a custodial interrogation under *Miranda*. The right to counsel, however, turns upon the same point of inquiry—whether the custodial interrogation is deliberately designed to elicit information that will buttress the revocation charge which brought about the probationer's incarceration. If the interrogation is of such a nature then *Miranda* warnings must be given and an appropriate waiver of the right to counsel and right against self-incrimination obtained before the interrogation begins.

I am authorized to state that Chief Justice HARSHBARGER joins me in this concurrence.

McGRAW, Justice, dissenting:

I dissent for the reasons stated in Justice Miller's concurring opinion.