Keith M. SCOTT, Petitioner,

v.

**PENNSYLVANIA BOARD OF PROBATION AND PAROLE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 28, 1995.

Decided Nov. 30, 1995.

George W. Westervelt, Jr., for petitioner.

Arthur R. Thomas, Assistant Chief Counsel, for respondent.

Before DOYLE and KELLEY, JJ., and NARICK, Senior Judge.

KELLEY, Judge.

Keith M. Scott appeals from an administrative order of the Pennsylvania Board of Probation and Parole denying his request for administrative relief from the board's revocation decision recommitting him as a technical parole violator. We reverse and remand.

On April 2, 1992, Scott was sentenced to a 10-to-20 year term of imprisonment on his *nolo contendere* plea to the crime of third degree murder. With an effective date of March 31, 1983, the Department of Corrections calculated the minimum expiration date on Scott's sentence as March 31, 1993, and the maximum term expiration date as March 31, 2003. On September 1, 1993, Scott was released on parole subject to a number of conditions.

On February 4, 1994, the board issued a warrant to commit and detain Scott, and a notice of charges and hearing based on his alleged technical violation of parole conditions 5b, 5c and 7. The notice alleged the following charges:

1. *Violation of Condition No. 5b:* YOU SHALL REFRAIN FROM OWNING OR POSSESSING ANY FIREARMS OR OTHER WEAPONS. (3 counts)

 a. On 9-4-93, you were in possession of a 22 Magnum revolver pistol.

 b. During September of 1993, you were in possession of a 10 millimeter Glock handgun.

 c. On 2-4-94, the following weapons were confiscated from your approved residence: one (1) Mossberg 12 gauge

pump shotgun, serial no. G878391; one (1) Glenfield 12 gauge bolt action shotgun, serial no. 71357747; one (1) Stevens 12 gauge single shotgun, no serial number; one (1) Harrington–Richardson 12 gauge single shotgun, serial no. 918060; one (1) Glenfield .22 caliber semi-automatic, Model 60, serial no. 23506068, and one (1) Green Camo–Colored Compound bow plus three arrows.

2. *Violation of Condition No. 5c:* YOU SHALL REFRAIN FROM ANY ASSAULTIVE BEHAVIOR.

During November of 1993, you threatened a co-worker, Gerald Thomas, by approaching Mr. Thomas and stating "I am going to fuckin kill you" numerous times.

3. *Violation of Condition No. 7, Special Condition:* YOU MUST NOT CONSUME ALCOHOL UNDER ANY CONDITION OR FOR ANY REASON. (2 counts)

a. On or about 9–2–93, you consumed Zima Clear Malt alcoholic beverages.

b. On or about 1–18–94, you consumed Southern Comfort alcoholic beverages.

(Certified Record (R.), pp. 10–11). On March 23, 1994, another notice of charges and hearing alleging the same technical parole violations was issued by the board. (R., pp. 24–25).

On March 30, 1994, a hearing was held on the alleged violations before John Engle, a hearing examiner. In support of Counts 1(a) and 3(a), the board called Eric Hahn as a witness. Because Hahn was reluctant to testify at the hearing, the board introduced an affidavit signed by him to establish the alleged violations. Scott then made a statement, admitting the allegation contained in Count 1(a). Scott also introduced an affidavit executed by Hahn which indicated that his prior affidavit was executed under pressure by parole agents.

In support of Counts 1(b), 2 and 3(b), the board called Ray Opperlee. Opperlee testified and was cross-examined regarding these alleged violations of Scott's parole conditions. Scott denied the allegation in Count 3(b), stating that the only alcohol he had consumed while on parole was contained in pre-scription cough syrup. Scott did not comment on the other two counts.

In support of Count 1(c), the board called Larry Mundro, a parole supervisor. Mundro testified regarding a search that had been conducted on Scott's approved residence, his parents' house. Mundro found a number of weapons in the house. Scott argued that the search was executed in violation of his rights against unreasonable searches and seizures, and sought the exclusion of this evidence on these grounds. The hearing officer permitted Mundro to testify over Scott's objection.

In response, Scott stated that the weapons recovered from his parents' house were owned by his stepfather. Scott stated that, before his release, he had instructed his mother and stepfather that they must get rid of all of the guns in the house in order for him to stay there. Scott stated further that his mother had told him that she had taken all of his stepfather's guns from the house, and that he had no idea that the weapons were still there. In addition, the room in which the weapons were found was his mother's private sitting area. When he would come home at night, Scott stated, he would see his mother in there watching television.

At the hearing Scott's stepfather, John McDaniel, stated that the weapons recovered from the house were owned by him. Mr. McDaniel testified that after he was told that he would have to dispose of the weapons, he wrapped them up to give them to his brother. In addition, Mr. McDaniel indicated that the room in which the weapons were found was used exclusively by his wife to watch television.

Finally, in support of Count 3(a), the board called Parole Agent Loren Dunham to testify. Dunham stated that after he had arrested Scott on the parole violation charges, Scott admitted that he had consumed alcohol while on parole. Again, in defense of the charges, Scott stated that the only alcohol he had consumed while on parole, or that he admitted to consuming while on parole, was contained in prescription cough syrup.

On June 16, 1994, the board mailed Scott its decision regarding his parole violations. The board found that evidence had been

presented to support the charges in Counts 1(a), 1(b), 1(c) and 3(a). In rendering this decision, the board relied on the following evidence: Scott's admissions regarding Counts 1(a) and (c); the testimony of Opperlee regarding Counts 1(b) and 2; the testimony of Mundro regarding Count 1(c); and the affidavit of Hahn regarding Counts 1(a) and 3(a). As a result, the board recommitted Scott to serve the remainder of his sentence and 36 months backtime. On September 6, 1994, the board modified its previous decision by adding two aggravating reasons for its decision; namely, that Scott had committed multiple violations and that he is considered a threat. Scott sought administrative relief from the board which was denied in a decision mailed on November 9, 1994. This appeal followed.

On appeal, Scott claims:[1] (1) the hearing examiner erred in allowing the introduction of evidence obtained in violation of his Fourth Amendment rights to support Count 1(c); (2) the hearing examiner erred in allowing the introduction of hearsay evidence to support Count 3(a) without a specific finding of good cause; (3) the violations found at Counts 1(c) and 3(a) are not supported by substantial evidence; (4) his recommitment to 36 months of backtime is not supported by substantial competent evidence and was done without adequate written justification; and (5) the notice of the hearing and charges for his preliminary and revocation hearings were improperly vague.

■ This court's scope of review of an adjudication by the board is limited to a determination of whether or not it is supported by substantial evidence, is in accordance with the law, and is observant of the petitioner's constitutional rights. *Johnson v. Pennsylvania Board of Probation and Parole*, 129 Pa.Cmwlth. 652, 566 A.2d 918 (1989), *aff'd*, 525 Pa. 573, 583 A.2d 790 (1991).

On appeal, Scott first claims that the warrantless non-consensual search of his parents' home violated his Fourth Amendment rights against unreasonable searches and seizures. At the parole revocation hearing, the board called Mundro as a witness to support

the charges alleged at Count 1(c). (R., pp. 73–86). Mundro was present when Scott was arrested for the alleged violations while he was at a diner with a companion. (R., pp. 76, 80). Prior to his arrest, Mundro was told that there might be firearms present in Scott's approved residence. (R., p. 85). As a result, after securing a key from Scott, Mundro and other parole agents accompanied Scott's companion to his approved residence to search for firearms. (R., pp. 75–76, 78, 80).

Upon arriving at Scott's approved residence, Mundro gave Scott's companion the key and she unlocked the kitchen door. (R., p. 76). As soon as they entered the home, Scott's companion called his mother, Mrs. McDaniel, the owner of the home. *Id.* Mundro instructed all of the agents to remain in the kitchen while awaiting Mrs. McDaniel's arrival. *Id.* When she arrived, Mundro told Mrs. McDaniel that he was going to conduct a search of her son's bedroom and asked her to direct him to that room. (R., pp. 76–77). When Mrs. McDaniel hesitated to disclose this information, Mundro told her that he and the agents would go upstairs and locate and search his room themselves. (R., p. 77). Mrs. McDaniel acquiesced and escorted Mundro and the agents upstairs and pointed out her son's bedroom. *Id.*

After Mrs. McDaniel had gone back downstairs to the kitchen, Mundro searched a room adjacent to Scott's bedroom. (R., pp. 80, 81). The room contained two small sofas with an ironing board in between them, and a television set at the far end. (R., p. 80). Mundro found five firearms under one of the sofas in the room. (R., p. 81). One of the guns recovered was in a zippered shotgun case; the other four were wrapped in a white cloth with electrical tape securing the cloth. (R., pp. 81, 84). None of the guns were loaded, and Mundro did not find any ammunition. (R., pp. 83, 84). Mundro also found a compound bow and three arrows in a closet in the room. (R., pp. 81–82).

After uncovering the weapons, Mundro interviewed Mrs. McDaniel regarding their ownership. (R., pp. 82–83). He advised Mrs. McDaniel that he was confiscating the

---

**1.** In the interest of clarity, we consolidate and reorder Scott's claims on appeal.

weapons because they were discovered in her son's approved residence and, in his opinion, they were accessible to Scott. (R., p. 83). Mrs. McDaniel indicated that none of the guns belonged to her son and that they all belonged to her husband. *Id.*

Scott's counsel attempted to exclude Mundro's testimony, arguing that his search of the home was illegal as it was conducted without the consent of the homeowner. (R., pp. 73–74, 75, 77, 79). When asked by the hearing examiner to explain his legal responsibilities and the legal guidelines he follows in conducting a search, Mundro stated:

> [A]ny individual under the supervision of the Pennsylvania Board of Probation and Parole can have his residence searched by representatives of the Board with or without the homeowner's permission if this is the parolee or probationer's approved residence. I was merely informing Mr. Scott's mother that we were going to search, and I asked her to please show us where his bedroom was. We also have the right to search any common living areas in the residence.

(R., p. 78).

In allowing the admission of the testimony, the hearing examiner stated:

> [T]he issue is on the record. My finding regarding this issue is that there were— that the consent—that the search (INAUDIBLE) was a bit unusual but within requirements so established for consent by residences of parolees by parole agents and the Commonwealth. So let's go forward having resolved the issue of the search.

(R., pp. 79–80).

■ The Fourth Amendment to the United States Constitution states, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searched and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." U.S. Const. amend. IV. It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573,

100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The physical entry into the home is the chief evil against which the wording of the Fourth Amendment is directed. *Id.*

Although a search must usually be undertaken only pursuant to a warrant based upon probable cause, the United States Supreme Court has permitted exceptions when "special needs" beyond the normal need for law enforcement make the warrant and probable cause requirements impracticable. *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). In *Griffin*, a probationer's house was searched by probation officers acting without a warrant, on information from a police tip. The search was conducted under state regulations which allowed any probation officer to search a probationer's home without a warrant as long as his supervisor approved, and there were "reasonable grounds" to believe that contraband was present. The officers found a handgun which later served as the basis for a prosecution for a weapons offense. The probationer sought suppression of the handgun, alleging that it was obtained in violation of his Fourth Amendment rights. His suppression motion was denied and he was convicted of the weapons charge. His conviction was subsequently affirmed by the state appellate courts. *Griffin*, 483 U.S. at 870–72, 107 S.Ct. at 3167–68.

■ The United States Supreme Court granted certiorari to consider whether the search violated the probationer's Fourth Amendment rights. *Id.* at 870, 107 S.Ct. at 3166. The Court noted that a probationer does not enjoy the absolute liberty to which every citizen is entitled, but only a conditional liberty dependent upon the observance of probation restrictions. *Id.* at 874, 107 S.Ct. at 3169. However, a probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be "reasonable". *Id.* at 873, 107 S.Ct. at 3168.

The Court reasoned that a state's operation of a probation system, like its operation of a school, government office or prison, presents "special needs" beyond normal law enforcement which justifies departure from the usual warrant and probable cause requirements of the Fourth Amendment. *Id.*

at 873–74, 107 S.Ct. at 3168. The "special needs" of the probation system made the warrant requirement impracticable, and justified the replacement of the probable cause standard with the "reasonable grounds" standard as contained in the state regulations. *Id.* at 875–76, 107 S.Ct. at 3169–70. Thus, the search of the probationer's home in *Griffin* satisfied the Fourth Amendment because it was carried out under a regulation which itself satisfied the Fourth Amendment's "reasonableness" requirement. *Id.* at 873, 107 S.Ct. at 3168.

■ In *Commonwealth v. Pickron*, 535 Pa. 241, 634 A.2d 1093 (1993), the Pennsylvania Supreme Court acknowledged that parolees have limited Fourth and Fifth Amendment rights in parole revocation hearings.[2] In *Pickron*, parole agents went to the parolee's residence with a warrant for her arrest based on her failure to report. When they arrived, the agents advised her mother that they intended to search the house for her daughter, and they were admitted for that limited purpose. While searching a small office in the apartment, an agent found a bottle of quinine, a cutting agent for heroin. An expanded search of the office, the parolee's bedroom and the kitchen yielded three packets containing a white substance, a packet containing a green weed, a plastic bottle containing another cutting agent, and a number of items used to package contraband. The parolee was arrested on her arrival at the apartment. Criminal charges were filed against her based on the items recovered in the search. Prior to trial, the parolee sought suppression of the items recovered from the apartment. The trial court granted the suppression motion; however, the Superior Court reversed the order granting suppression. *Pickron*, 535 Pa. at 243–44, 634 A.2d at 1094–95.

The Pennsylvania Supreme Court granted allocatur to examine the Fourth Amendment rights of a parolee. *Id.* at 245, 634 A.2d at 1095. Relying on *Griffin*, the court reversed the Superior Court order and reinstated the trial court order suppressing the items seized

in the search. *Id.* at 247–48, 634 A.2d at 1096–98. Our Supreme Court stated:

> In the instant case[,] we do not have before us a statutory or regulatory framework nor an agreement by the [parolee] consenting to the search. Thus, we are confronted with the issue left unaddressed by Griffin. We hold therefore that the fourth amendment prohibits the warrantless search of probationers or parolees' residences based upon reasonable suspicion without the consent of the owner or without a statutory or regulatory framework governing the search. We do so because we recognize that there are no safeguards to protect the limited fourth amendments rights of probationers and parolees if their supervision is left entirely to the discretion of individual parole officers. In the traditional fourth amendment case, the warrant requirement based upon probable cause and issued by a neutral and detached magistrate guarantees the protection of a citizen's constitutional rights. Similarly, in the context of a probationer or parolee's limited fourth amendment rights, some systemic procedural safeguards must be in place to guarantee those limited fourth amendment rights. In the absence of any statutory or regulatory framework, or an agreement explicitly setting out the rights of the [parolee] and the authority of the state to supervise the [parolee], we are constrained to conclude that the actions of these parole officers violated the fourth amendment.

*Id.* at 249–50, 634 A.2d at 1098 (footnote omitted).

■ Thus, under *Pickron*, a parole agent may not conduct a warrantless search of a parolee's residence in the absence of (1) the consent of the owner; or (2) a statutory or regulatory framework which satisfies the "reasonableness" requirement of the Fourth Amendment. *Commonwealth v. Richardson*, —— Pa.Superior Ct. ——, 664 A.2d 1042 (1995); *Commonwealth v. Walter*, 440 Pa.Superior Ct. 263, 655 A.2d 554 (1995); *Com-*

---

**2.** Despite the minor differences between probation and parole, the revocation of probation where sentence has been previously imposed is

constitutionally indistinguishable from the revocation of parole. *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

*monwealth v. Alexander*, 436 Pa.Superior Ct. 335, 647 A.2d 935 (1994).

 In the instant case, it is clear that Mundro did not obtain the owner's valid consent to conduct a search of Scott's approved residence. In order for consent to an otherwise illegal search to be valid, the consent must be unequivocal, specific and voluntary. *Commonwealth v. Gibson*, 536 Pa. 123, 638 A.2d 203 (1994). To be effective, a consent to search must be voluntarily given with a total absence of duress or coercion, express or implied. *Commonwealth v. Lowery*, 305 Pa.Superior Ct. 66, 451 A.2d 245 (1982). It is only where there is an intentional relinquishment or abandonment of a known right or privilege that an effective waiver can be found. *Gibson.* The subject of a search must be made aware of her rights against a warrantless search for a waiver to be intelligent. *Id.*

 Mundro gained entrance to Scott's approved residence by using a key recovered from him when he was arrested. (R., pp. 75–76). Once Mundro and the other agents were inside the kitchen, Mrs. McDaniel was contacted. (R., p. 76). When Mrs. McDaniel arrived, Mundro told her that he was going to search her son's bedroom and asked her to direct him to that room. (R., pp. 76–77). When she hesitated to disclose this information, Mundro told her that he and the other agents would go upstairs and locate and search the room themselves. (R., p. 77). Mrs. McDaniel acquiesced and directed Mundro to her son's bedroom; however, after she had gone back downstairs to the kitchen, Mundro found the weapons in his search of a room adjacent to her son's bedroom. (R., pp. 77, 80, 81). Under these circumstances, it is clear that Mrs. McDaniel did not voluntarily, intelligently and unequivocally consent to the search conducted by Mundro. *Gibson; Lowery.*

In addition, when asked by the hearing examiner the guidelines under which he may conduct a search, Mundro stated that "[a]ny individual under the supervision of the Pennsylvania Board of Probation and Parole can have his residence searched by representatives of the Board with or without the homeowner's permission...." (R., p. 78). Apparently, Mundro perceived that he had boundless authority to conduct a search of the residence. However, Mundro did not cite any statutory or regulatory framework granting him the authority to conduct such a search. *Id.*[3]

 The "statutory or regulatory framework" referred to in *Pickron* requires the passage of a statute or regulation through the appropriate legislative process complete with publication in either the Pennsylvania Statutes or the Pennsylvania Bulletin. *Richardson; Alexander.* Our research has uncovered no enacted statute or regulation which would grant Mundro the authority to conduct such a search. Because Mundro's warrantless search of Scott's approved residence was conducted without the owner's consent and without a statutory or regulatory framework authorizing such a search, we must conclude that the search was conducted in violation of Scott's limited Fourth Amendment rights. *Pickron; Richardson; Walter; Alexander.*

 Finding that the search violated Scott's Fourth Amendment rights, we must now address whether the evidence obtained in the search should have been excluded from the revocation hearing. The Fourth Amendment contains no provision precluding the use of evidence obtained in violation of its commands. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Rather, the exclusionary rule was adopted by the United States Supreme Court to effectuate

---

**3.** It should be noted that at the time he was paroled, Scott signed a Pennsylvania Board of Probation and Parole form PBPP–11 (Rev. 7/91) which is entitled "Conditions of Parole/Reparole" and states, in pertinent part:

> I expressly consent to the search of my person, property and residence, without a warrant by

agents of the Pennsylvania Board of Probation and Parole. Any items, in the possession of which constitutes a violation of parole/reparole shall be subject to seizure, and may be used as evidence in the parole revocation process.

However, this consent paragraph does not comport with the dictates of *Pickron. Richardson; Walter.*

the Fourth Amendment rights of citizens against unreasonable searches and seizures. *Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987); *Calandra.* The purpose of the rule is not to redress the injury to the privacy of the victim of the search; its prime purpose is to deter future unlawful police conduct thereby effectuating the Fourth Amendment guarantees against unreasonable searches and seizures. *Krull; Calandra.* Thus, the rule operates as a judicially created remedy designed to generally safeguard Fourth Amendment rights through its deterrent effect, rather than to vindicate the personal constitutional rights of the aggrieved party. *Krull; Leon; Calandra.*

■ Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to preclude the use of illegally obtained evidence in all proceedings or against all persons. *Id.* The issue of whether the exclusionary rule should be applied in a particular case is separate from the question of whether the Fourth Amendment rights of the aggrieved party were violated by police conduct. *Leon.* The application of the rule has been limited to those areas where its remedial objectives are thought to be most efficaciously served. *Krull; Calandra.* Therefore, in order to extend the rule beyond its traditional application in criminal prosecutions, the court must weigh the rule's potential for deterring unlawful actions against the damage of withholding reliable information from the truth-seeking process. *Krull; Leon; Calandra. See also Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Calandra.*

■ To date, the United States Supreme Court has not addressed the issue of whether the exclusionary rule is applicable to parole revocation proceedings. However, the Court has used the balancing of interests framework first enunciated in *Calandra* to determine whether the rule should be applied beyond its traditional application. *See, e.g., INS v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (deportation proceedings); *Janis* (a taxpayer refund

suit); *Calandra* (grand jury proceedings). Therefore, we must apply the *Calandra* analytical framework to determine whether it is appropriate to extend the application of the exclusionary rule to parole revocation proceedings.

■ In general, the essence of parole is release from prison before the completion of the sentence, on the condition that the parolee abide by certain rules during the balance of the sentence. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Its purpose is to help individuals reintegrate into society as constructive individuals. *Gagnon; Morrissey.* Thus, it is primarily concerned with the rehabilitation and restoration of the parolee to a useful life. *Commonwealth v. Marchesano,* 519 Pa. 1, 544 A.2d 1333 (1988); *Commonwealth v. Quinlan,* 488 Pa. 255, 412 A.2d 494 (1980); *Commonwealth v. Kates,* 452 Pa. 102, 305 A.2d 701 (1973). It is a discretionary penological measure to which a parolee has no absolute right. *Marchesano; Kates.*

■ The granting and rescinding of parole are purely administrative functions. *Rivenbark v. Pennsylvania Board of Probation and Parole,* 509 Pa. 248, 501 A.2d 1110 (1985). Because the revocation of parole is not part of a criminal prosecution, the full panoply of rights due to a criminal defendant does not apply to parole revocations. *Morrissey.* The state has an overwhelming interest in being able to return a parolee to imprisonment without the burden of a new adversary criminal trial if, in fact, the parolee has failed to abide by the conditions of his parole. *Id.* Thus, the hearing determining the revocation of parole should be flexible enough to consider evidence and materials that would not be admissible in an adversary criminal trial. *Id.; Kates.* The controlling consideration at a revocation hearing is whether the facts presented are probative and reliable, and not whether traditional rules of procedure have been strictly observed. *Marchesano; Quinlan; Kates.* As a result, the courts in Pennsylvania have generally declined to extend the exclusionary rule to parole revocation proceedings. *Id.; Knuckles v. Pennsylvania Board of Proba-*

*tion and Parole,* 111 Pa.Cmwlth. 487, 533 A.2d 1156 (1987); *Nickens v. Pennsylvania Board of Probation and Parole,* 93 Pa. Cmwlth. 313, 502 A.2d 277 (1985).

Pennsylvania is not alone in this regard. The majority of the federal courts that have addressed the application of the exclusionary rule to parole or probation revocation hearings have also concluded that, as a general rule, the rule is not applicable to these proceedings. *See, e.g., United States v. Finney,* 897 F.2d 1047 (10th Cir.1990); *United States v. Bazzano,* 712 F.2d 826 (3rd Cir.1983); *United States v. Frederickson,* 581 F.2d 711 (8th Cir.1978); *United States v. Vandemark,* 522 F.2d 1019 (9th Cir.1975); *United States v. Winsett,* 518 F.2d 51 (9th Cir.1975); *United States v. Farmer,* 512 F.2d 160 (6th Cir. 1975); *United States v. Brown,* 488 F.2d 94 (5th Cir.1973); *United States v. Hill,* 447 F.2d 817 (7th Cir.1971); *United States ex rel. Sperling v. Fitzpatrick,* 426 F.2d 1161 (2nd Cir.1970).

Only the United States Court of Appeals for the Fourth Circuit has held that the exclusionary rule is generally applicable to revocation hearings. *United States v. Workman,* 585 F.2d 1205 (4th Cir.1978). *See also United States v. Rea,* 678 F.2d 382 (2nd Cir.1982) (Evidence seized by a probation officer in a warrantless search of a probationer's home is inadmissible at a subsequent probation revocation hearing as the deterrent effect of the exclusionary rule substantially outweighs the injury to the function of the proceedings).

In addition, a number of state courts have also declined to apply the exclusionary rule to revocation proceedings as a general rule. *See, e.g., Ex parte Caffie,* 516 So.2d 831 (Ala.1987); *State v. Sears,* 553 P.2d 907 (Alaska 1976); *State v. Shirley,* 117 Ariz. 105, 570 P.2d 1278 (1977); *Harris v. State,* 270 Ark. 634, 606 S.W.2d 93 (App.1980); *In re Tyrell J.,* 8 Cal.4th 68, 876 P.2d 519, 32 Cal.Rptr.2d 33 (1994); *People v. Ressin,* 620 P.2d 717 (Colo.1980); *Payne v. Robinson,* 207 Conn. 565, 541 A.2d 504 (1988); *Thompson v. United States,* 444 A.2d 972 (D.C. 1982); *People v. Watson,* 69 Ill.App.3d 497, 26 Ill.Dec. 19, 387 N.E.2d 849 (1979); *Dulin v. State,* 169 Ind.App. 211, 346 N.E.2d 746 (1976); *Kain v. State,* 378 N.W.2d 900 (Iowa 1985); *State v. Turner,* 19 Kan.App.2d 535, 873 P.2d 208 (1994); *State v. Davis,* 375 So.2d 69 (La.1979); *State v. Caron,* 334 A.2d 495 (Me.1975); *Chase v. State,* 309 Md. 224, 522 A.2d 1348 (1987); *Commonwealth v. Olsen,* 405 Mass. 491, 541 N.E.2d 1003 (1989); *People v. Perry,* 201 Mich.App. 347, 505 N.W.2d 909 (1993); *State v. Thorsness,* 165 Mont. 321, 528 P.2d 692 (1974); *State v. Field,* 132 N.H. 760, 571 A.2d 1276 (1990); *People v. Jackson,* 46 N.Y.2d 171, 412 N.Y.S.2d 884, 385 N.E.2d 621 (1978); *State v. Lombardo,* 306 N.C. 594, 295 S.E.2d 399 (1982); *Richardson v. State,* 841 P.2d 603 (Okla.Crim.1992); *State v. Spratt,* 120 R.I. 192, 386 A.2d 1094 (1978); *Hughes v. Gwinn,* 170 W.Va. 87, 290 S.E.2d 5 (1982); *Gronski v. State,* 700 P.2d 777 (Wyo.1985).

Only a handful of state courts have found that, under their state constitutions, the exclusionary rule is generally applicable to revocation proceedings. *See, e.g., State v. Cross,* 487 So.2d 1056 (Fla.1986); *State ex rel. Juvenile Department of Multnomah County v. Rogers,* 314 Or. 114, 836 P.2d 127 (1992); *Mason v. State,* 838 S.W.2d 657 (Tex.App. 1992); *State v. Lampman,* 45 Wash.App. 228, 724 P.2d 1092 (1986).

However, some of the federal courts that have declined to generally apply the exclusionary rule to revocation proceedings have acknowledged that it may be appropriate in some circumstances. *See, e.g., Winsett; Bazzano; Vandemark; Rea.* A number of state courts have also acknowledged the rule's application to revocation proceedings may be appropriate in some circumstances. *See, e.g., Kain,* 378 N.W.2d at 902 (where the evidence was gathered for the express purpose of influencing the revocation of probation); *Sears,* 553 P.2d at 914 (where the officers know that the suspect is a probationer); *Caffie,* 516 So.2d at 836 (where the illegal acts of the police were directed specifically at a probationer or where they shock the conscience); *Shirley,* 117 Ariz. at 106, 570 P.2d at 1280 (where police searches are consciously directed toward probationers); *Ressin,* 620 P.2d at 720–21 (where law enforcement officers knowingly engage in a pretextual arrest and exploratory search because of a suspect's

probationary status); *Thompson,* 444 A.2d at 975 (where the illegal acts of a government agent were directed specifically at a probationer or shock the conscience); *Turner,* 19 Kan.App.2d at ——, 873 P.2d at 210–12 (where the law enforcement officer knows that the victim of the search is a probationer); *Davis,* 375 So.2d at 75 (where the illegal search was conducted by the police in bad faith and was purposely directed at a probationer by officers with knowledge of the probationer's status); *Caron,* 334 A.2d at 499, n. 6 (where there is proof of widespread police harassment); *Richardson,* 841 P.2d at 605–06 (where the illegal acts of the police were directed specifically at a probationer or where they shock the conscience). Under these circumstances, the state courts found that the deterrent effect of applying the exclusionary rule would outweigh the resultant injury to the revocation process by the exclusion of the evidence.

Applying the balance of interests framework to the facts of this case, it is clear that the deterrence factor substantially outweighs the injury which would result from excluding the evidence obtained from Mundro's illegal search of Scott's approved residence. At the time Mundro went to the house, Scott had already been arrested for alleged parole violations. Mundro's sole purpose for conducting the search was to uncover evidence of additional violations. To recover this evidence, Mundro gained entrance to the house without Mrs. McDaniel's knowledge or consent. Once Mrs. McDaniel had arrived, she reluctantly directed Mundro and the other agents upstairs to Scott's bedroom. After she had gone back downstairs, Mundro expanded his search to another room adjacent to Scott's bedroom.

■ Under these circumstances, the application of the exclusionary rule is necessary and proper to proscribe a search such as the one conducted by Mundro in this case. In a case such as this, the need to exclude the improperly obtained evidence outweighs the injury to the parole revocation process which would be caused by the exclusion. *See, e.g.,*

*Workman; Rea; Shirley; Turner; Kain; Davis; Sears.*

As a result, the hearing officer should have excluded the evidence obtained in the illegal search at Scott's parole revocation hearing. Because this evidence was improperly admitted over Scott's objection, we must reverse and remand this case for a new revocation hearing. *See Wagner v. Pennsylvania Board of Probation and Parole,* 92 Pa. Cmwlth. 132, 498 A.2d 1007 (1985) (remand for a new hearing appropriate where hearsay evidence improperly admitted over parolee's objection); *Grello v. Pennsylvania Board of Probation and Parole,* 83 Pa.Cmwlth. 252, 477 A.2d 45 (1984) (same).

Scott next claims that the hearing officer erred in admitting Hahn's affidavit into evidence because it was hearsay evidence. In support of Counts 1(a) and 3(a) of the charges, the board called Eric Hahn as a witness. (R., pp. 33–52). However, at the hearing Hahn indicated that he was reluctant to testify. (R., pp. 33, 36–40). As a result, the board introduced an affidavit signed by Hahn to establish the alleged violations over Scott's objection. (R., pp. 40, 47). Hahn was questioned regarding the execution of the affidavit; however, he was not questioned on the substantive allegations contained therein. (R., pp. 34–35, 38–39, 40–47).

Scott then introduced another affidavit executed by Hahn which indicated that his prior affidavit was executed under pressure by parole agents. (R., pp. 47–52). He also admitted the allegation contained in Count 1(a). (R., pp. 52–55).[4]

■ In revocation hearings, documentary evidence and reports, including affidavits, may be used if the hearing examiner is satisfied as to their authenticity, relevancy, accuracy and reliability. 37 Pa.Code § 71.5(b). However, the introduction of hearsay evidence at a revocation hearing over counsel's objection where the hearing examiner fails to make a finding of good cause for admitting such evidence, constitutes reversible error. *Wagner; Grello.*

4. Scott notes that the affidavit was introduced by the board to show that he had committed Counts 1(a) and 3(a). However, because he admitted that he had committed Count 1(a), he was prejudiced by its admission only as it relates to proving that he committed Count 3(a).

In this case, the hearing examiner admitted Hahn's affidavit over counsel's objection without making the requisite finding of good cause. As this was the only evidence introduced to show that Scott committed Count 3(a), we must reverse and remand for a new hearing on this claim as well. *Wagner; Grello.*

Based on our disposition of Scott's first two claims, we will not address the other claims raised on appeal. Accordingly, the order of the board is reversed and the case is remanded for a new hearing.

### ORDER

NOW, this 30th day of November, 1995, the decision of the Pennsylvania Board of Probation and Parole, mailed November 9, 1994, at Parole No. 4488–X, is reversed, and this matter is remanded for proceedings consistent with this opinion.

Jurisdiction relinquished.