# PENNSYLVANIA BOARD OF PROBATION AND PAROLE *v.* SCOTT

No. 97–581.   Argued March 30, 1998—Decided June 22, 1998

358

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and KENNEDY, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 369. SOUTER, J., filed a dissenting opinion, in which GINSBURG and BREYER, JJ., joined, *post*, p. 370.

*D. Michael Fisher*, Attorney General of Pennsylvania, argued the cause for petitioner. With him on the briefs were *John G. Knorr III*, Chief Deputy Attorney General, and *Gregory R. Neuhauser* and *Calvin R. Koons*, Senior Deputy Attorneys General.

*Malcolm L. Stewart* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Waxman, Acting Assistant At-*

torney General *Keeney,* Deputy Solicitor General *Dreeben,* and *Vicki Marani.*

*Leonard N. Sosnov* argued the cause for respondent. With him on the brief was *David Rudovsky.**

JUSTICE THOMAS delivered the opinion of the Court.

This case presents the question whether the exclusionary rule, which generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights, applies in parole revocation hearings. We hold that it does not.

I

Respondent Keith M. Scott pleaded *nolo contendere* to a charge of third-degree murder and was sentenced to a prison

---

*Briefs of *amici curiae* urging reversal were filed for the State of Ohio et al. by *Betty D. Montgomery,* Attorney General of Ohio, *Jeffrey S. Sutton,* State Solicitor, and *Todd R. Marti,* Assistant Attorney General, by *John M. Ferren,* Corporation Counsel of the District of Columbia, and by the Attorneys General for their respective States as follows: *Grant Woods* of Arizona, *M. Jane Brady* of Delaware, *Robert Butterworth* of Florida, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *Jeff Modisett* of Indiana, *Tom Miller* of Iowa, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *Peter Verniero* of New Jersey, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Jeffrey B. Pine* of Rhode Island, *Mark Barnett* of South Dakota, *John Knox Walkup* of Tennessee, *Jan Graham* of Utah, *Wallace J. Malley* of Vermont, and *William U. Hill* of Wyoming; for Americans for Effective Law Enforcement, Inc., et al. by *Wayne W. Schmidt, James P. Manak, Richard M. Weintraub,* and *Bernard J. Farber;* for the Center for the Community Interest by *Andrew N. Vollmer* and *Roger L. Conner;* and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger.*

*Tracey Maclin, Steven R. Shapiro, Stefan Presser,* and *Lisa B. Kemler* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

term of 10 to 20 years, beginning on March 31, 1983. On September 1, 1993, just months after completing the minimum sentence, respondent was released on parole. One of the conditions of respondent's parole was that he would refrain from "owning or possessing any firearms or other weapons." App. 5a. The parole agreement, which respondent signed, further provided:

> "I expressly consent to the search of my person, property and residence, without a warrant by agents of the Pennsylvania Board of Probation and Parole. Any items, in [sic] the possession of which constitutes a violation of parole/reparole shall be subject to seizure, and may be used as evidence in the parole revocation process." Id., at 7a.

About five months later, after obtaining an arrest warrant based on evidence that respondent had violated several conditions of his parole by possessing firearms, consuming alcohol, and assaulting a co-worker, three parole officers arrested respondent at a local diner. Before being transferred to a correctional facility, respondent gave the officers the keys to his residence. The officers entered the home, which was owned by his mother, but did not perform a search for parole violations until respondent's mother arrived. The officers neither requested nor obtained consent to perform the search, but respondent's mother did direct them to his bedroom. After finding no relevant evidence there, the officers searched an adjacent sitting room in which they found five firearms, a compound bow, and three arrows.

At his parole violation hearing, respondent objected to the introduction of the evidence obtained during the search of his home on the ground that the search was unreasonable under the Fourth Amendment. The hearing examiner, however, rejected the challenge and admitted the evidence. As a result, the Pennsylvania Board of Probation and Parole found sufficient evidence in the record to support the weap-

ons and alcohol charges and recommitted respondent to serve 36 months' backtime.

The Commonwealth Court of Pennsylvania reversed and remanded, holding, *inter alia*, that the hearing examiner had erred in admitting the evidence obtained during the search of respondent's residence.[1] The court ruled that the search violated respondent's Fourth Amendment rights because it was conducted without the owner's consent and was not authorized by any state statutory or regulatory framework ensuring the reasonableness of searches by parole officers. 668 A. 2d 590, 596 (1995). The court further held that the exclusionary rule should apply because, in the circumstances of respondent's case, the deterrence benefits of the rule outweighed its costs. *Id.,* at 600.[2]

The Pennsylvania Supreme Court affirmed. 548 Pa. 418, 698 A. 2d 32 (1997). The court stated that respondent's Fourth Amendment right against unreasonable searches and seizures was "unaffected" by his signing of the parole agreement giving parole officers permission to conduct warrantless searches. *Id.,* at 427, 698 A. 2d, at 36. It then held that the search in question was unreasonable because it was supported only by "mere speculation" rather than a "reasonable suspicion" of a parole violation. *Ibid.* Carving out an exception to its *per se* bar against application of the exclusionary rule in parole revocation hearings, see *Commonwealth* v. *Kates,* 452 Pa. 102, 120, 305 A. 2d 701, 710 (1973), the court further ruled that the federal exclusionary rule applied to this case because the officers who conducted the

---

[1] The court also held that the Board of Probation and Parole erred by admitting hearsay evidence regarding alcohol consumption and a separate incident of weapons possession.

[2] While this case was pending in the Pennsylvania Supreme Court, the Commonwealth Court filed an en banc opinion in another case that overruled its decision in respondent's case and held that the exclusionary rule does not apply in parole revocation hearings. *Kyte* v. *Pennsylvania Bd. of Probation and Parole,* 680 A. 2d 14, 18, n. 8 (1996).

search were aware of respondent's parole status, 548 Pa., at 428–432, 698 A. 2d, at 37–38. The court reasoned that, in the absence of the rule, illegal searches would be undeterred when officers know that the subjects of their searches are parolees and that illegally obtained evidence can be introduced at parole hearings. *Ibid.*

We granted certiorari to determine whether the Fourth Amendment exclusionary rule applies to parole revocation proceedings. 522 U. S. 992 (1997).[3]

## II

We have emphasized repeatedly that the government's use of evidence obtained in violation of the Fourth Amendment does not itself violate the Constitution. See, *e. g., United States* v. *Leon,* 468 U. S. 897, 906 (1984); *Stone* v. *Powell,* 428 U. S. 465, 482, 486 (1976). Rather, a Fourth Amendment violation is " 'fully accomplished' " by the illegal search or seizure, and no exclusion of evidence from a judicial or administrative proceeding can " 'cure the invasion of the defendant's rights which he has already suffered.' " *United States* v. *Leon, supra,* at 906 (quoting *Stone* v. *Powell, supra,* at 540

[3] We also invited the parties to brief the question whether a search of a parolee's residence must be based on reasonable suspicion where the parolee has consented to searches as a condition of parole. Respondent argues that we lack jurisdiction to decide this question in this case because the Pennsylvania Supreme Court held, as a matter of Pennsylvania law, that respondent's consent to warrantless searches as a condition of his state parole did not constitute consent to searches that are unreasonable under the Fourth Amendment. Petitioner and its *amici* contend that the Pennsylvania Supreme Court's opinion was at least ambiguous as to whether it relied on state or federal law to determine the extent of respondent's consent, and that we therefore have jurisdiction under *Michigan* v. *Long,* 463 U. S. 1032 (1983). We need not parse the Pennsylvania Supreme Court's decision in an attempt to discern its intent, however, because it is clear that we have jurisdiction to determine whether the exclusionary rule applies to state parole revocation proceedings, and our decision on that issue is sufficient to decide the case. We therefore express no opinion regarding the constitutionality of the search.

(White, J., dissenting)). The exclusionary rule is instead a judicially created means of deterring illegal searches and seizures. *United States* v. *Calandra,* 414 U. S. 338, 348 (1974). As such, the rule does not "proscribe the introduction of illegally seized evidence in all proceedings or against all persons," *Stone* v. *Powell, supra,* at 486, but applies only in contexts "where its remedial objectives are thought most efficaciously served," *United States* v. *Calandra, supra,* at 348; see also *United States* v. *Janis,* 428 U. S. 433, 454 (1976) ("If . . . the exclusionary rule does not result in appreciable deterrence, then, clearly, its use in the instant situation is unwarranted"). Moreover, because the rule is prudential rather than constitutionally mandated, we have held it to be applicable only where its deterrence benefits outweigh its "substantial social costs." *United States* v. *Leon,* 468 U. S., at 907.

Recognizing these costs, we have repeatedly declined to extend the exclusionary rule to proceedings other than criminal trials. *Id.,* at 909; *United States* v. *Janis, supra,* at 447. For example, in *United States* v. *Calandra,* we held that the exclusionary rule does not apply to grand jury proceedings; in so doing, we emphasized that such proceedings play a special role in the law enforcement process and that the traditionally flexible, nonadversarial nature of those proceedings would be jeopardized by application of the rule. 414 U. S., at 343–346, 349–350. Likewise, in *United States* v. *Janis,* we held that the exclusionary rule did not bar the introduction of unconstitutionally obtained evidence in a civil tax proceeding because the costs of excluding relevant and reliable evidence would outweigh the marginal deterrence benefits, which, we noted, would be minimal because the use of the exclusionary rule in criminal trials already deterred illegal searches. 428 U. S., at 448, 454. Finally, in *INS* v. *Lopez-Mendoza,* 468 U. S. 1032 (1984), we refused to extend the exclusionary rule to civil deportation proceedings, citing the high social costs of allowing an immigrant to remain illegally

in this country and noting the incompatibility of the rule with the civil, administrative nature of those proceedings. *Id.*, at 1050.

As in *Calandra, Janis,* and *Lopez-Mendoza,* we are asked to extend the operation of the exclusionary rule beyond the criminal trial context. We again decline to do so. Application of the exclusionary rule would both hinder the functioning of state parole systems and alter the traditionally flexible, administrative nature of parole revocation proceedings. The rule would provide only minimal deterrence benefits in this context, because application of the rule in the criminal trial context already provides significant deterrence of unconstitutional searches. We therefore hold that the federal exclusionary rule does not bar the introduction at parole revocation hearings of evidence seized in violation of parolees' Fourth Amendment rights.

Because the exclusionary rule precludes consideration of reliable, probative evidence, it imposes significant costs: It undeniably detracts from the truthfinding process and allows many who would otherwise be incarcerated to escape the consequences of their actions. See *Stone* v. *Powell, supra,* at 490. Although we have held these costs to be worth bearing in certain circumstances,[4] our cases have repeatedly emphasized that the rule's "costly toll" upon truth-seeking and law enforcement objectives presents a high obstacle for those

---

[4] As discussed above, we have generally held the exclusionary rule to apply only in criminal trials. We have, moreover, significantly limited its application even in that context. For example, we have held that the rule does not apply when the officer reasonably relied on a search warrant that was later deemed invalid, *United States* v. *Leon,* 468 U. S. 897, 920–922 (1984); when the officer reasonably relied on a statute later deemed unconstitutional, *Illinois* v. *Krull,* 480 U. S. 340, 349–350 (1987); when the defendant seeks to assert another person's Fourth Amendment rights, *Alderman* v. *United States,* 394 U. S. 165, 174–175 (1969); and when the illegally obtained evidence is used to impeach a defendant's testimony, *United States* v. *Havens,* 446 U. S. 620, 627–628 (1980); *Walder* v. *United States,* 347 U. S. 62, 65 (1954).

urging application of the rule. *United States* v. *Payner*, 447 U. S. 727, 734 (1980).

The costs of excluding reliable, probative evidence are particularly high in the context of parole revocation proceedings. Parole is a "variation on imprisonment of convicted criminals," *Morrissey* v. *Brewer*, 408 U. S. 471, 477 (1972), in which the State accords a limited degree of freedom in return for the parolee's assurance that he will comply with the often strict terms and conditions of his release. In most cases, the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements. The State thus has an "overwhelming interest" in ensuring that a parolee complies with those requirements and is returned to prison if he fails to do so. *Id.*, at 483. The exclusion of evidence establishing a parole violation, however, hampers the State's ability to ensure compliance with these conditions by permitting the parolee to avoid the consequences of his noncompliance. The costs of allowing a parolee to avoid the consequences of his violation are compounded by the fact that parolees (particularly those who have already committed parole violations) are more likely to commit future criminal offenses than are average citizens. See *Griffin* v. *Wisconsin*, 483 U. S. 868, 880 (1987). Indeed, this is the very premise behind the system of close parole supervision. *Ibid.*

The exclusionary rule, moreover, is incompatible with the traditionally flexible, administrative procedures of parole revocation. Because parole revocation deprives the parolee not "of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions," *Morrissey* v. *Brewer*, *supra*, at 480, States have wide latitude under the Constitution to structure parole revocation proceedings.[5] Most

---

[5] We thus have held that a parolee is not entitled to "the full panoply" of due process rights to which a criminal defendant is entitled, *Morrissey* v. *Brewer*, 408 U. S. 471, 480 (1972), and that the right to counsel generally

States, including Pennsylvania, see 548 Pa., at 427–428, 698 A. 2d, at 36; *Rivenbark* v. *Pennsylvania Bd. of Probation and Parole,* 509 Pa. 248, 501 A. 2d 1110 (1985), have adopted informal, administrative parole revocation procedures in order to accommodate the large number of parole proceedings. These proceedings generally are not conducted by judges, but instead by parole boards, "members of which need not be judicial officers or lawyers." *Morrissey* v. *Brewer,* 408 U. S., at 489. And traditional rules of evidence generally do not apply. *Ibid.* ("[T]he process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial"). Nor are these proceedings entirely adversarial, as they are designed to be " 'predictive and discretionary' as well as factfinding." *Gagnon* v. *Scarpelli,* 411 U. S. 778, 787 (1973) (quoting *Morrissey* v. *Brewer, supra,* at 480).

Application of the exclusionary rule would significantly alter this process. The exclusionary rule frequently requires extensive litigation to determine whether particular evidence must be excluded. Cf. *United States* v. *Calandra,* 414 U. S., at 349 (noting that application of the exclusionary rule "would delay and disrupt grand jury proceedings" because "[s]uppression hearings would halt the orderly process of an investigation and might necessitate extended litigation of issues only tangentially related to the grand jury's primary objective"); *INS* v. *Lopez-Mendoza,* 468 U. S., at 1048 (noting that "[t]he prospect of even occasional invocation of the exclusionary rule might significantly change and complicate the character of" the deportation system). Such litigation is inconsistent with the nonadversarial, administrative processes established by the States. Although States could adapt their parole revocation proceedings to accommodate

---

does not attach to such proceedings because the introduction of counsel would "alter significantly the nature of the proceeding," *Gagnon* v. *Scarpelli,* 411 U. S. 778, 787 (1973).

such litigation, such a change would transform those proceedings from a "predictive and discretionary" effort to promote the best interests of both parolees and society into trial-like proceedings "less attuned" to the interests of the parolee. *Gagnon* v. *Scarpelli, supra,* at 787–788 (quoting *Morrissey* v. *Brewer, supra,* at 480). We are simply unwilling so to intrude into the States' correctional schemes. See *Morrissey* v. *Brewer, supra,* at 483 (recognizing that States have an "overwhelming interest" in maintaining informal, administrative parole revocation procedures). Such a transformation ultimately might disadvantage parolees because in an adversarial proceeding, "the hearing body may be less tolerant of marginal deviant behavior and feel more pressure to reincarcerate than to continue nonpunitive rehabilitation." *Gagnon* v. *Scarpelli, supra,* at 788. And the financial costs of such a system could reduce the State's incentive to extend parole in the first place, as one of the purposes of parole is to reduce the costs of criminal punishment while maintaining a degree of supervision over the parolee.

The deterrence benefits of the exclusionary rule would not outweigh these costs. As the Supreme Court of Pennsylvania recognized, application of the exclusionary rule to parole revocation proceedings would have little deterrent effect upon an officer who is unaware that the subject of his search is a parolee. 548 Pa., at 431, 698 A. 2d, at 38. In that situation, the officer will likely be searching for evidence of criminal conduct with an eye toward the introduction of the evidence at a criminal trial. The likelihood that illegally obtained evidence will be excluded from trial provides deterrence against Fourth Amendment violations, and the remote possibility that the subject is a parolee and that the evidence may be admitted at a parole revocation proceeding surely has little, if any, effect on the officer's incentives. Cf. *United States* v. *Janis,* 428 U. S., at 448.

The Pennsylvania Supreme Court thus fashioned a special rule for those situations in which the officer performing the

search knows that the subject of his search is a parolee. We decline to adopt such an approach. We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence. *United States* v. *Calandra, supra,* at 350; *Alderman* v. *United States,* 394 U. S. 165, 174 (1969). Furthermore, such a piecemeal approach to the exclusionary rule would add an additional layer of collateral litigation regarding the officer's knowledge of the parolee's status.

In any event, any additional deterrence from the Pennsylvania Supreme Court's rule would be minimal. Where the person conducting the search is a police officer, the officer's focus is not upon ensuring compliance with parole conditions or obtaining evidence for introduction at administrative proceedings, but upon obtaining convictions of those who commit crimes. The noncriminal parole proceeding "falls outside the offending officer's zone of primary interest." *Janis, supra,* at 458. Thus, even when the officer knows that the subject of his search is a parolee, the officer will be deterred from violating Fourth Amendment rights by the application of the exclusionary rule to criminal trials.

Even when the officer performing the search is a parole officer, the deterrence benefits of the exclusionary rule remain limited. Parole agents, in contrast to police officers, are not "engaged in the often competitive enterprise of ferreting out crime," *United States* v. *Leon,* 468 U. S., at 914; instead, their primary concern is whether their parolees should remain free on parole. Thus, their relationship with parolees is more supervisory than adversarial. *Griffin* v. *Wisconsin,* 483 U. S. 868, 879 (1987). It is thus "unfair to assume that the parole officer bears hostility against the parolee that destroys his neutrality; realistically the failure of the parolee is in a sense a failure for his supervising officer." *Morrissey* v. *Brewer, supra,* at 485–486. Although this relationship does not prevent parole officers from *ever* violating the Fourth Amendment rights of their parolees, it does mean

that the harsh deterrent of exclusion is unwarranted, given such other deterrents as departmental training and discipline and the threat of damages actions. Moreover, although in some instances parole officers may act like police officers and seek to uncover evidence of illegal activity, they (like police officers) are undoubtedly aware that any unconstitutionally seized evidence that could lead to an indictment could be suppressed in a criminal trial. In this case, assuming that the search violated respondent's Fourth Amendment rights, the evidence could have been inadmissible at trial if respondent had been criminally prosecuted.

\* \* \*

We have long been averse to imposing federal requirements upon the parole systems of the States. A federal requirement that parole boards apply the exclusionary rule, which is itself a "'grud[g]ingly taken, medicament,'" *United States* v. *Janis, supra,* at 455, n. 29, would severely disrupt the traditionally informal, administrative process of parole revocation. The marginal deterrence of unreasonable searches and seizures is insufficient to justify such an intrusion. We therefore hold that parole boards are not required by federal law to exclude evidence obtained in violation of the Fourth Amendment. Accordingly, the judgment below is reversed, and the case is remanded to the Pennsylvania Supreme Court.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

JUSTICE SOUTER has explained why the deterrent function of the exclusionary rule is implicated as much by a parole revocation proceeding as by a conventional criminal trial. I agree with that explanation. I add this comment merely to endorse Justice Stewart's conclusion that the "rule *is* constitutionally required, not as a 'right' explicitly incorporated in the fourth amendment's prohibitions, but as a remedy necessary to ensure that those prohibitions are observed in fact."

Stewart, The Road to *Mapp* v. *Ohio* and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases, 83 Colum. L. Rev. 1365, 1389 (1983). See also *Arizona* v. *Evans*, 514 U. S. 1, 18–19, and n. 1 (1995) (STEVENS, J., dissenting); *Segura* v. *United States*, 468 U. S. 796, 828, and n. 22 (1984) (STEVENS, J., dissenting); *United States* v. *Leon*, 468 U. S. 897, 978, and n. 37 (1984) (STEVENS, J., dissenting).

JUSTICE SOUTER, with whom JUSTICE GINSBURG and JUSTICE BREYER join, dissenting.

The Court's holding that the exclusionary rule of *Mapp* v. *Ohio*, 367 U. S. 643 (1961), has no application to parole revocation proceedings rests upon mistaken conceptions of the actual function of revocation, of the objectives of those who gather evidence in support of petitions to revoke, and, consequently, of the need to deter violations of the Fourth Amendment that would tend to occur in administering the parole laws. In reality a revocation proceeding often serves the same function as a criminal trial, and the revocation hearing may very well present the only forum in which the State will seek to use evidence of a parole violation, even when that evidence would support an independent criminal charge. The deterrent function of the exclusionary rule is therefore implicated as much by a revocation proceeding as by a conventional trial, and the exclusionary rule should be applied accordingly. From the Court's conclusion to the contrary, I respectfully dissent.

This Court has said that the primary purpose of the exclusionary rule "is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States* v. *Calandra*, 414 U. S. 338, 347 (1974). Because the exclusionary rule thus "operates as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitu-

tional right of the party aggrieved," *United States* v. *Leon,* 468 U. S. 897, 906 (1984) (internal quotation marks omitted), "[w]hether the exclusionary sanction is appropriately imposed in a particular case . . . is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.' " *Ibid.* (quoting *Illinois* v. *Gates,* 462 U. S. 213, 223 (1983)). The exclusionary rule does not, therefore, mandate the exclusion of illegally acquired evidence from all proceedings or against all persons, *United States* v. *Calandra, supra,* at 348, and we have made clear that the rule applies only in "those instances where its remedial objectives are thought most efficaciously served," *Arizona* v. *Evans,* 514 U. S. 1, 11 (1995). Only then can the deterrent value of applying the rule to a given class of proceedings be seen to outweigh its price, including "the loss of often probative evidence and all of the secondary costs that flow from the less accurate or more cumbersome adjudication that therefore occurs." *INS* v. *Lopez-Mendoza,* 468 U. S. 1032, 1041 (1984); see also *United States* v. *Janis,* 428 U. S. 433, 454 (1976); *United States* v. *Calandra, supra,* at 349–350.

Because we have found the requisite efficacy when the rule is applied in criminal trials, see *Elkins* v. *United States,* 364 U. S. 206 (1960); *Mapp* v. *Ohio, supra; Weeks* v. *United States,* 232 U. S. 383 (1914), the deterrent effect of the evidentiary limitation upon prosecution is a baseline for evaluating the degree (or incremental degree) of deterrence that could be expected from extending the exclusionary rule to other sorts of cases, see *INS* v. *Lopez-Mendoza, supra.* Thus, we have thought that any additional deterrent value obtainable from applying the rule in civil tax proceedings, see *United States* v. *Janis, supra,* habeas proceedings, see *Stone* v. *Powell,* 428 U. S. 465 (1976), and grand jury proceedings, see *United States* v. *Calandra, supra,* would be so marginal as to be outweighed by the incremental costs.

In *Janis*, for example, we performed incremental benefit analysis by focusing on the two classes of law enforcement officers affected. We reasoned that when the offending official was a state police officer, his "zone of primary interest" would be state criminal prosecution, not federal civil proceedings; accordingly, we said, "common sense dictates that the deterrent effect of the exclusion of relevant evidence is highly attenuated when the 'punishment' imposed upon the offending criminal enforcement officer is the removal of that evidence from a civil suit by or against a different sovereign." 428 U. S., at 457–458. *Stone* v. *Powell* was another variant on the same theme, where we looked to the collateral nature of the habeas proceedings in which the rule might be applied: "The view that the deterrence of Fourth Amendment violations would be furthered rests on the dubious assumption that law enforcement authorities would fear that federal habeas review might reveal flaws in a search or seizure that went undetected at trial and on appeal." 428 U. S., at 493. And in *United States* v. *Calandra* we observed that excluding such evidence from grand jury proceedings "would deter only police investigation[s] consciously directed toward the discovery of evidence solely for use in a grand jury investigation," 414 U. S., at 351; an investigation so unambitious would be a rare one, we said, since prosecutors are unlikely to seek indictments in the face of dim prospects of conviction after trial, *ibid.*

In a formal sense, such is the reasoning of the Court's majority in deciding today that application of the exclusionary rule in parole revocation proceedings would have only an insignificant marginal deterrent value, "because application of the rule in the criminal trial context already provides significant deterrence of unconstitutional searches." *Ante*, at 364. In substance, however, the Court's conclusion will not jibe with the examples just cited, for it rests on erroneous views of the roles of regular police and parole officers in relation to revocation proceedings, and of the practical significance of the proceedings themselves.

As to the police, the majority says that regular officers investigating crimes almost always act with the prospect of a criminal prosecution before them. Their fear of evidentiary suppression in the criminal trial will have as much deterrent effect as can be expected, therefore, while any risk of suppression in parole administration is too unlikely to be on their minds to influence their conduct.

The majority's assumption will only sometimes be true, however, and in many, or even most cases, it will quite likely be false. To be sure, if a police officer acts on the spur of the moment to seize evidence or thwart crime, he may have no idea of a perpetrator's parole status. But the contrary will almost certainly be the case when he has first identified the person he has his eye on: the local police know the local felons, criminal history information is instantly available nationally, and police and parole officers routinely cooperate. See, e. g., United States ex rel. Santos v. New York State Bd. of Parole, 441 F. 2d 1216, 1217 (CA2 1971) (police officer, who had obtained "reasonable grounds" to believe that the parolee was dealing in stolen goods, informed the parole officer; the parole officer and police officer together searched parolee's apartment), cert. denied, 404 U. S. 1025 (1972); Grimsley v. Dodson, 696 F. 2d 303, 304 (CA4 1982) (upon receipt of information about probationer, probation officer contacted a sheriff, sheriff obtained search warrant, and together they searched probationer's house), cert. denied, 462 U. S. 1134 (1983); State ex rel. Wright v. Ohio Adult Parole Auth., 75 Ohio St. 3d 82, 83–84, 661 N. E. 2d 728, 730 (1996) (police officers suspected parolee had committed burglary and asked his parole officer to search his residence; parolee was then reincarcerated for violating his parole conditions); People v. Stewart, 242 Ill. App. 3d 599, 611–612, 610 N. E. 2d 197, 206 (1993) (police conducting illegal traffic stop and subsequent search and seizure knew or had reason to know that defendant was on probation); People v. Montenegro, 173 Cal. App. 3d 983, 986, 219 Cal. Rptr. 331, 332 (4th Dist. 1985) (police contacted parole agent so that they could conduct search of

parolee's apartment); see also Pennsylvania Board of Proba-
tion and Parole, Police Procedures in the Handling of Parol-
ees 16 (rev. 1974) (parole agent has a responsibility to inform
police in the area where parolee will be living and to provide
"full cooperation to the police").

As these cases show, the police very likely do know a pa-
rolee's status when they go after him, and (contrary to the
majority's assumption) this fact is significant for three rea-
sons. First, and most obviously, the police have reason for
concern with the outcome of a parole revocation proceeding,
which is just as foreseeable as the criminal trial and at least
as likely to be held. Police officers, especially those em-
ployed by the same sovereign that runs the parole system,
therefore have every incentive not to jeopardize a recom-
mitment by rendering evidence inadmissible. See *INS* v.
*Lopez-Mendoza*, 468 U. S., at 1043 (deterrence especially ef-
fective when law enforcement and prosecution are under one
government). Second, as I will explain below, the actual
likelihood of trial is often far less than the probability of a
petition for parole revocation, with the consequence that the
revocation hearing will be the only forum in which the evi-
dence will ever be offered. Often, therefore, there will be
nothing incremental about the significance of evidence of-
fered in the administrative tribunal, and nothing "marginal"
about the deterrence provided by an exclusionary rule op-
erating there. *Ante*, at 368. Finally, the cooperation be-
tween parole and police officers, as in the instances shown in
the cases cited above, casts serious doubt upon the aptness
of treating police officers differently from parole officers,
doubt that is confirmed by the following attention to the
Court's characterization of the position of the parole officer.

The Court recalls our description of the police as "engaged
in the often competitive enterprise of ferreting out crime,"
which raises the temptation to cut constitutional corners
(which in turn requires the countervailing influence of the
exclusionary rule). *United States* v. *Leon*, 468 U. S., at 914.

As against this picture of the police, the Court paints the parole officer as a figure more nearly immune to such competitive zeal. As the Court describes him, the parole officer is interested less in catching a parole violator than in making sure that the parolee continues to go straight, since "'realistically the failure of the parolee is in a sense a failure for his supervising officer.'" *Ante*, at 368 (quoting *Morrissey* v. *Brewer*, 408 U. S. 471, 485–486 (1972)). This view of the parole officer suffers, however, from its selectiveness. Parole officers wear several hats; while they are indeed the parolees' counselors and social workers, they also "often serve as both prosecutors and law enforcement officials in their relationship with probationers and parolees." N. Cohen & J. Gobert, Law of Probation and Parole § 11.04, p. 533 (1983); see also *Minnesota* v. *Murphy*, 465 U. S. 420, 432 (1984) (probation officer "is a peace officer, and as such is allied, to a greater or lesser extent, with his fellow peace officers" (internal quotation marks omitted)); T. Wile, Pennsylvania Law of Probation and Parole § 5.12, p. 88 (1993) (parole officers "act in various capacities, supervisor, social worker, advocate, police officer, investigator and advisor, to the offenders under their supervision"). Indeed, a parole officer's obligation to petition for revocation when a parolee goes bad, see Cohen & Gobert, *supra*, § 11.04, at 533, is presumably the basis for the legal rule in Pennsylvania that "state parole agents are considered police officers with respect to the offenders under their jurisdiction," Wile, *supra*, § 5.12, at 89.

Once, in fact, the officer has turned from counselor to adversary, there is every reason to expect at least as much competitive zeal from him as from a regular police officer. See *Gagnon* v. *Scarpelli*, 411 U. S. 778, 785 (1973) ("[A]n exclusive focus on the benevolent attitudes of those who administer the probation/parole system when it is working successfully obscures the modification in attitude which is likely to take place once the officer has decided to recommend revocation"). If he fails to respond to his parolee's further crimi-

nality he will be neglecting the public safety, and if he brings a revocation petition without enough evidence to sustain it he can hardly look forward to professional advancement. R. Prus & J. Stratton, Parole Revocation Decisionmaking: Private Typings and Official Designations, 40 Federal Probation 51 (Mar. 1976). And as for competitiveness, one need only ask whether a parole officer would rather leave the credit to state or local police when a parolee has to be brought to book.

The Court, of course, does not mean to deny that parole officers are subject to some temptation to skirt the limits on search and seizure, but it believes that deterrents other than the evidentiary exclusion will suffice. The Court contends that parole agents will be kept within bounds by "departmental training and discipline and the threat of damages actions." *Ante*, at 369. The same, of course, might be said of the police, and yet as to them such arguments are not heard, perhaps for the same reason that the Court's suggestion sounds hollow as to parole officers. The Court points to no specific departmental training regulation; it cites no instance of discipline imposed on a Pennsylvania parole officer for conducting an illegal search of a parolee's residence; and, least surprisingly of all, the majority mentions not a single lawsuit brought by a parolee against a parole officer seeking damages for an illegal search. In sum, if the police need the deterrence of an exclusionary rule to offset the temptations to forget the Fourth Amendment, parole officers need it quite as much.[1]

---

[1] While it is true that the Court found in *INS* v. *Lopez-Mendoza*, 468 U. S. 1032 (1984), that the deterrence value of applying the exclusionary rule in deportation proceedings was diminished because the INS "has its own comprehensive scheme for deterring Fourth Amendment violations by its officers," *id.*, at 1044, and "alternative remedies for institutional practices by the INS that might violate Fourth Amendment rights" were available, *id.*, at 1045, these two factors reflected what was at least on the agency's books and, in any event, did not stand alone. The Court in that case found that as a practical matter "it is highly unlikely that any particu-

Just as the Court has underestimated the competitive influences tending to induce police and parole officers to stint on Fourth Amendment obligations, so I think it has misunderstood the significance of admitting illegally seized evidence at the revocation hearing. On the one hand, the majority magnifies the cost of an exclusionary rule for parole cases by overemphasizing the differences between a revocation hearing and a trial, and on the other hand it has minimized the benefits by failing to recognize the significant likelihood that the revocation hearing will be the principal, not the secondary, forum, in which evidence of a parolee's criminal conduct will be offered.

The Court is, of course, correct that the revocation hearing has not only an adversarial side in factfinding, but a predictive and discretionary aspect in addressing the proper disposition when a violation has been found. See *ante,* at 366 (citing *Gagnon* v. *Scarpelli, supra,* at 787 (quoting *Morrissey* v. *Brewer, supra,* at 480)). And I agree that open-mindedness at the discretionary, dispositional stage is promoted by the relative informality of the proceeding even at its factfinding stage. *Gagnon* v. *Scarpelli, supra,* at 786. That informality is fostered by limiting issues so that lawyers are not always necessary, 411 U. S., at 787–788, and by appointing lay members to parole boards, *Morrissey* v. *Brewer, supra,* at 489. There is no question, either, that application of an exclusionary rule, if there is no waiver of Fourth Amendment rights, will tend to underscore the adversary character of the factfinding process. This cannot, however, be a dispositive objection to an exclusionary rule. Any revocation hearing is adversary to a degree: counsel must now be provided whenever the complexity of fact issues so warrant, *Gagnon* v. *Scarpelli, supra,* at 787, and lay board members are just as capable of passing upon Fourth Amend-

---

lar arrestee will end up challenging the lawfulness of his arrest in a formal deportation proceeding." *Id.,* at 1044. As the instant case may suggest, there is no reason to expect parolees to be so reticent.

ment issues as the police, who are necessarily charged with responsibility for the legality of warrantless arrests, investigatory stops, and searches.[2]

As to the benefit of an exclusionary rule in revocation proceedings, the majority does not see that in the investigation of criminal conduct by someone known to be on parole, Fourth Amendment standards will have very little deterrent sanction unless evidence offered for parole revocation is subject to suppression for unconstitutional conduct. It is not merely that parole revocation is the government's consolation prize when, for whatever reason, it cannot obtain a further criminal conviction, though that will sometimes be true. See, *e. g., State ex rel. Wright* v. *Ohio Adult Parole Auth.*, 75 Ohio St. 3d, at 83–89, 661 N. E. 2d, at 730 (State sought revocation of parole when criminal prosecution was dismissed for insufficient evidence after defendant's motion to suppress was successful); *Anderson* v. *Virginia*, 20 Va. App. 361, 363–364, 457 S. E. 2d 396, 397 (1995) (same); *Chase* v. *Maryland*, 309 Md. 224, 228, 522 A. 2d 1348, 1350 (1987) (same); *Gronski* v. *Wyoming*, 700 P. 2d 777, 778 (Wyo. 1985) (same). What is at least equally telling is that parole revocation will frequently be pursued instead of prosecution as the course of choice, a fact recognized a quarter of a century

---

[2] On the subject of cost, the majority also argues that the cost of applying the exclusionary rule to revocation proceedings would be high because States have an "'overwhelming interest'" in ensuring that its parolees comply with the conditions of their parole, given the fact that parolees are more likely to commit future crimes than average citizens. *Ante*, at 365. I certainly do not contest the fact, but merely point out that it does not differentiate suppression at parole hearings from suppression at trials, where suppression of illegally obtained evidence in the prosecution's case in chief certainly takes some toll on the State's interest in convicting criminals in the first place. The majority's argument suggests not that the exclusionary rule is necessarily out of place in parole revocation proceedings, but that States should be permitted to condition parole on an agreement to submit to warrantless, suspicionless searches, on the possibility of which this case has no bearing. See *infra*, at 379–380.

ago when we observed in *Morrissey* v. *Brewer* that a parole revocation proceeding "is often preferred to a new prosecution because of the procedural ease of recommitting the individual on the basis of a lesser showing by the State." 408 U. S., at 479; see also Cohen & Gobert, § 8.06, at 386 ("Favoring the [exclusionary] rule's applicability is the fact that the revocation proceeding, often based on the items discovered in the search, is used in lieu of a criminal trial").

The reasons for this tendency to skip any new prosecution are obvious. If the conduct in question is a crime in its own right, the odds of revocation are very high. Since time on the street before revocation is not subtracted from the balance of the sentence to be served on revocation, *Morrissey* v. *Brewer*, 408 U. S., at 480, the balance may well be long enough to render recommitment the practical equivalent of a new sentence for a separate crime. And all of this may be accomplished without shouldering the burden of proof beyond a reasonable doubt; hence the obvious popularity of revocation in place of new prosecution.

The upshot is that without a suppression remedy in revocation proceedings, there will often be no influence capable of deterring Fourth Amendment violations when parole revocation is a possible response to new crime. Suppression in the revocation proceeding cannot be looked upon, then, as furnishing merely incremental or marginal deterrence over and above the effect of exclusion in criminal prosecution. Instead, it will commonly provide the only deterrence to unconstitutional conduct when the incarceration of parolees is sought, and the reasons that support the suppression remedy in prosecution therefore support it in parole revocation.

Because I would apply the exclusionary rule to evidence offered in revocation hearings, I would affirm the judgment in this case. Scott gave written consent to warrantless searches; the form he signed provided that he consented "to the search of my person, property and residence, without a warrant by agents of the Pennsylvania Board of Probation

and Parole." App. 7a. The Supreme Court of Pennsylvania held the consent insufficient to waive any requirement that searches be supported by reasonable suspicion,[3] and in the absence of any such waiver, the State was bound to justify its search by what the Court has described as information indicating the likelihood of facts justifying the search. *Griffin* v. *Wisconsin*, 483 U. S. 868 (1987) (dealing with the analogous context of probation revocation). The State makes no claim here to have satisfied this standard. It describes the parole agent's knowledge as rising no further than "the possibility of the presence of weapons in Scott's home," Brief for Petitioner 7, and rests on the argument that not even reasonable suspicion was required.

Because the search violated the Fourth Amendment, and because I conclude that the exclusionary rule ought to apply to parole revocation proceedings, I would affirm the decision of the Supreme Court of Pennsylvania.

---

[3] See 548 Pa. 418, 426, 698 A. 2d 32, 35–36 (1997) ("'[T]he parolee's signing of a parole agreement giving his parole officer permission to conduct a warrantless search does not mean either that the parole officer can conduct a search at any time and for any reason or that the parolee relinquishes his Fourth Amendment right to be free from unreasonable searches. Rather, the parolee's signature acts as acknowledgement that the parole officer has a right to conduct reasonable searches of his residence listed on the parole agreement without a warrant'") (quoting *Commonwealth* v. *Williams*, 547 Pa. 577, 588, 692 A. 2d 1031, 1036 (1997)). Since Pennsylvania has not sought review of this conclusion, I do not look behind it, or offer any opinion on whether the terms and sufficiency of such a waiver are to be scrutinized under state or federal law.