**UNITED STATES of America, Plaintiff–Appellee–Cross– Appellant,**

v.

**Felix Nicholas MEDINA, Defendant– Appellant–Cross–Appellee.**

**Nos. 97–50148, 97–50149.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 7, 1998.

Filed June 22, 1999.

Monica Knox, Deputy Federal Public Defender, Los Angeles, California, for the defendant-appellant-cross-appellee.

Luis Li and Gregory J. Weingart, Assistant United States Attorneys, Los Angeles, California, for the plaintiff-appellee-cross-appellant.

Before: FLETCHER, THOMPSON, and LEAVY, Circuit Judges.

LEAVY, Senior Circuit Judge:

Felix Nicholas Medina appeals his conviction for armed bank robbery and using a firearm while committing a violent crime in violation of 18 U.S.C. § 2113(a) and (d)

and 18 U.S.C. § 924(c). Medina contends that the district court erred in denying his request for an evidentiary hearing to determine whether evidence was lawfully seized. The government cross-appeals, arguing that the district court erred by imposing concurrent rather than consecutive sentences for six of Medina's ten convictions under 18 U.S.C. § 924(c). We affirm the district court's denial of an evidentiary hearing, reverse its imposition of concurrent sentences, and remand for resentencing.

I.

In 1990, Medina pled guilty to armed bank robbery and was sentenced to 63 months in prison. After his release from prison, he was deported to Mexico. However, within months of deportation, Medina returned to the United States and embarked on a bank robbery spree for which he now stands convicted.

Medina committed ten separate armed bank robberies in an eight-month period between September 1995, and May 1996. Prior to trial, Medina moved to suppress evidence which included a .25 caliber handgun and a .38 caliber handgun. These two guns linked Medina to at least six of the ten bank robberies. The guns had been seized in two separate searches as described below.

In December 1995, Medina checked his luggage at a ticket counter at the Los Angeles airport. His luggage was x-rayed and a handgun was discovered. Medina was paged to return to the ticket counter, but he did not return. The airport police removed a .25 caliber handgun from Medina's luggage and turned it over to the Los Angeles Police Department.

About one month later, in January 1996, Medina was stopped by the Los Angeles police because the registration tags on the car he was driving had apparently expired. Because Medina was unable to provide proof of a driver's license, the car was impounded and searched. During the search, the police found a .38 caliber revolver. This revolver was booked into evidence at the Los Angeles Police Department. Medina was arrested and charged with being a felon in possession of a firearm. Those charges were dismissed after a municipal court judge granted Medina's motion to suppress. The judge determined that the police did not have reasonable suspicion to stop the car Medina was driving. The revolver, however, remained in the custody of the Los Angeles police.

About four months later, in May 1996, Medina was identified by federal investigators as a possible suspect in a string of armed bank robberies. One of the robbery victims had described a car and gun similar to the car and gun involved in Medina's January 1996, traffic stop. Following this lead, the federal investigators retrieved Medina's .38 caliber revolver which was still in the custody of the Los Angeles police. The federal investigators conducted ballistics tests and discovered that the revolver was the gun that had fired a shot in one of the robberies. Medina was arrested on the bank robbery charges on May 29, 1996.

After his arrest, Medina described the various guns he had used in the bank robberies. He told the investigators that he had lost the .25 caliber gun when he had tried to take it on an airplane flight. The investigators followed up on this information and retrieved the .25 caliber gun which was still in the custody of the Los Angeles police.

At the hearing on Medina's motion to suppress, Medina argued that the two searches were warrantless and without probable cause. He requested an evidentiary hearing on the legality of the searches. The district court denied the motion to suppress without holding an evidentiary hearing and without a determination whether the searches were lawful. The district court reasoned that even if the guns had been unlawfully seized, they were not subject to suppression because at the time of the searches, the local law

enforcement authorities did not have the federal investigation within their "zone of primary interest." Medina contends that this ruling is in error under *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

## II.

◼ The question presented is whether the Fourth Amendment requires an assessment of the legality of the two searches to determine the admissibility of the evidence in Medina's bank robbery trial. We reject Medina's argument that *Elkins* requires such an assessment.

In *Elkins,* state officials obtained a search warrant based on information that the defendants possessed obscene motion pictures. The search revealed no obscene pictures, but wiretap paraphernalia was found and seized. The defendants were indicted in state court on wiretap charges, but the state court held the search unlawful and the evidence inadmissible, so the indictment was dismissed. Shortly thereafter, federal officers used the wiretap evidence to bring federal wiretap charges against the defendants. The Supreme Court rejected the so-called "silver platter doctrine,"[1] and held that "evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial." *Elkins,* 364 U.S. at 223–24, 80 S.Ct. 1437.

Medina argues that *Elkins* mandates an assessment of the legality of the two searches because the searches were conducted by state and local officials and the evidence seized was subsequently used in a federal criminal trial. Medina overextends the *Elkins* holding.

◼ In *Elkins,* the Supreme Court invoked its "supervisory power over the administration of criminal justice in the federal courts" to exclude evidence obtained in an unlawful state search. *Elkins,* 364 U.S. at 216, 80 S.Ct. 1437. The Court stated that the test of the legality of the state search "is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Elkins,* 364 U.S. at 223–24, 80 S.Ct. 1437. One year later, the Court decided *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), which established the exclusionary rule as a constitutionally required remedy for unlawful searches at *both* the state and federal level.[2] Thus, under *Mapp,* the identity of the sovereign (state or federal) conducting the search is irrelevant to the application of the exclusionary rule. Nevertheless, the *Elkins* holding rejecting the "silver platter doctrine" is still valid. *See United States v. Perez–Castro,* 606 F.2d 251, 252 (9th Cir. 1979) ("The Government may not successfully assert that the illegal act was done by state or local officers and therefore the statements subsequently taken are admissible in a federal prosecution, without concern as to the method by which they were obtained." (citing *Elkins,* 364 U.S. at 223, 80 S.Ct. 1437)). Stated another way, *Elkins* continues to forbid the federal government from making the argument that another sovereign conducted the search, therefore it can ignore the methods by which the search was conducted.

---

**1.** The phrase "silver platter doctrine" was used by Justice Frankfurter in *Lustig v. United States,* 338 U.S. 74, 79, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949), and refers to the procedure whereby evidence illegally seized by state officers could be admitted in federal court so long as federal officers did not participate in the illegal seizure. The state officers were said to hand over the illegally seized evidence on a "silver platter." *See*

*United States v. Romero,* 585 F.2d 391, 397 n. 6 (9th Cir. 1978).

**2.** *See* Potter Stewart, *The Road to Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search and Seizure Cases,* 83 Colum. L.Rev. 1365, 1379–80 (1983).

The Supreme Court has stated that the exclusionary rule is a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *accord, United States v. Raftery*, 534 F.2d 854, 856–57 (9th Cir.1976). *See also United States v. Ceccolini*, 435 U.S. 268, 275, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) ("Recognizing not only the costs, which are often substantial, of the exclusionary rule, we have said that 'application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served,' [citing *Calandra*]."). Therefore, the inquiry is whether the connection between the searches and the instant proceeding is such that suppression of the evidence would result in appreciable deterrence. *See United States v. Basinger*, 60 F.3d 1400, 1407 (9th Cir.1995); *United States v. Lopez–Martinez*, 725 F.2d 471, 476 (9th Cir.1984).

The officers who performed the airport search and the vehicle search in the instant case had no knowledge or anticipation of Medina's subsequent prosecution for armed bank robbery. In other words, they did not have the bank robbery charges within their zone of primary interest. *See Lopez–Martinez*, 725 F.2d at 476. There is no suggestion of collusion between the officers who conducted the searches and the investigators who subsequently located the unclaimed guns. *See Basinger*, 60 F.3d at 1407 ("Here, as in *Lopez–Martinez*, 'there is no suggestion ... of any bad faith or collusion' by the officers involved in the 1991 and the in-

stant cases; 'the [officer] in [1991] did not have the [instant] proceedings in [his] zone of primary interest.' " (omitting additional citations)). In this case, the record indicates that it was the thorough investigative work by the investigators (rather than collusion with the officers who conducted the searches) which led them to the discovery of the guns which were still in the custody of the Los Angeles police.

Absent any threshold showing of a connection or "nexus" in time, place, or purpose between the searches and the subsequent prosecution, there is no appreciable deterrent purpose in suppressing the evidence.[3] Moreover, it is irrelevant to this inquiry whether the evidence is seized by one sovereign and utilized by the same or a different sovereign. *See Lopez–Martinez*, 725 F.2d at 476 (Statements made in a 1974 arrest by federal officers were admissible in a 1982 federal trial because the agents in 1974 did not have the later 1982 proceedings in their "zone of primary interest."). Accordingly, because there is no showing that the officers conducting the airport and traffic searches had the present proceeding within their zone of primary interest, the district court did not err in refusing to hold an evidentiary hearing on the lawfulness of the searches.

## III.

In its cross-appeal, the government contends that the district court erred in imposing concurrent sentences for three or more convictions under 18 U.S.C. § 924(c)(1). We agree that the district court erred in the sentencing.

Section 924(c)(1) provides, in relevant part:

3. The inquiry is similar to the inquiry under the "attenuated basis" exception to the "fruit of the poisonous tree" exclusionary rule. *See United States v. Smith*, 155 F.3d 1051, 1060 (9th Cir.1998) ("[T]he taint inquiry is more akin to a proximate causation analysis. That is, at some point, even in the event of a direct and unbroken causal chain, the relationship between the unlawful search or seizure and the challenged evidence becomes sufficiently weak to dissipate any taint resulting from the original illegality."); *United States v. Perez–Castro*, 606 F.2d 251, 253 (9th Cir.1979) (statements given by defendant to border patrol agents following an illegal arrest by local police "were not sufficiently attenuated from the arrest to purge them of the taint of the illegal arrest").

Whoever, during and in relation to any crime of violence ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence ... be sentenced to imprisonment for five years.... In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years.... Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence ... in which the firearm was used or carried.

█ The district court interpreted this statute to require a five-year consecutive sentence on the first section 924(c) conviction and a single twenty-year consecutive sentence of all "second or subsequent" section 924(c) convictions. In other words, the district court interpreted the statute to permit *concurrent* sentences for any third or subsequent conviction under section 924(c). We reject this interpretation because the language of the statute requires the imposition of a twenty-year *consecutive* sentence for each "second or subsequent" conviction.

The plain language of section 924(c) specifically prohibits concurrent sentences "notwithstanding any other provision of the law." The Supreme Court held that the language of section 924(c) indicated Congress's intent to make section 924(c) enhancements run consecutively to all other prison terms, whether state or federal. *See United States v. Gonzales,* 520 U.S. 1, 11, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997).

Medina argues that section 924(c) only prohibits sentences under that section to run concurrently with non-section 924(c) sentences. We rejected this argument in *United States v. Fontanilla,* 849 F.2d 1257, 1258 (9th Cir.1988), where we stated, "Nothing in the statute, or its legislative history, indicates one section 924 sentence can be made to run concurrently with another section 924 sentence." *Id.*

We AFFIRM the district court's refusal to hold an evidentiary hearing on the suppression issues, REVERSE the imposition of concurrent section 924(c) sentences, and REMAND for resentencing.

FLETCHER, Circuit Judge, dissenting:

In affirming the district court's denial of an evidentiary hearing on the Fourth Amendment issue, the majority relies on a "zone of primary interest" test that is unfaithful to Supreme Court precedent, in conflict with precedent from this court, and seriously misguided on its own terms. I cannot agree, and therefore respectfully dissent.

I.

The majority holds that the district court need not have assessed the legality of the two searches executed against Medina in order to admit the evidence gained from those searches in Medina's trial.[1] This holding relies on a reading of the "primary zone of interest" test that conflicts with clear Supreme Court precedent, most notably *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

In *Elkins,* the Supreme Court interpreted the exclusionary rule to prohibit the admission in a federal criminal trial of evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the Fourth Amendment. *Elkins,* 364 U.S. at 223, 80 S.Ct. 1437. In that case, state police offi-

1. The legality of the search on Medina's car is seriously in doubt. As the majority notes, state charges against Medina relating to the gun recovered from the car were dropped after a state court granted Medina's motion to suppress on the grounds that the police lacked a reasonable suspicion to stop the car.

cers procured a search warrant for the defendant's home in an effort to retrieve obscene motion pictures. *Id.* at 207 n. 1, 80 S.Ct. 1437. The search revealed no obscene pictures, but the police did find and seize paraphernalia they believed to have been used in making illegal wiretaps. *Id.* When state officials were unable to use the seized material, federal officers obtained the material and brought federal criminal charges against the defendant. *Id.* The district court determined that because federal officers did not participate in the search, there was no need for an inquiry into whether the state search had been lawful. *Id.* at 207, 80 S.Ct. 1437. The Supreme Court reversed, rejecting the "silver platter doctrine." It held that "evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial." *Id.* at 223, 80 S.Ct. 1437.

The majority concedes that *Elkins* "continues to forbid the federal government from making the argument that another sovereign conducted the search, therefore it can ignore the methods by which the search was conducted." Majority Opinion at 6714. The majority goes on, however, to credit a version of just such an argument. It holds that because the searches at issue in this case were conducted by state law enforcement officers with "no knowledge or anticipation of Medina's subsequent prosecution," the unconstitutionality of the searches is no bar to the federal government's use of the evidence. Majority Opinion at 6715. This version of the "zone of primary interest" test is at odds not only with the clear holding of *Elkins,* but with subsequent Supreme Court precedent as well.

The "zone of primary interest" test was first articulated by the Supreme Court in *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). In that case, the Court held that evidence illegally obtained by state officers in the course of a state criminal investigation could be used in a subsequent federal *civil* tax case. The Court reasoned that a state law enforcement officer is likely to be deterred from illegal action by the exclusion of evidence in all criminal proceedings, but he is not likely to be further deterred by excluding the evidence from civil proceedings because such proceedings are outside his "zone of primary interest." *Id.* at 458, 96 S.Ct. 3021. Accordingly, the Court held the evidence admissible.

Although the majority opinion does not cite it, *Janis* remains the governing Supreme Court case on the "zone of primary interest" issue. Rather than looking directly to *Janis,* the majority relies on two cases from our court that cite *Janis* but distort it beyond recognition. *See United States v. Basinger,* 60 F.3d 1400 (9th Cir. 1995); *United States v. Lopez–Martinez,* 725 F.2d 471 (9th Cir.1984). Those cases, in turn, relied on *United States v. Raftery,* 534 F.2d 854 (9th Cir.1976), which was decided before *Janis.* Together, *Raftery, Lopez–Martinez,* and *Basinger* held that evidence illegally obtained by state or federal officers could be used in subsequent federal prosecutions, provided the officers who acted illegally did not have the subsequent federal prosecution within their "zone of primary interest." *See Lopez–Martinez,* 725 F.2d at 476; *Basinger,* 60 F.3d at 1407. This extension of the "zone of primary interest" test to cases involving federal criminal prosecutions is in direct violation of *Elkins* and *Janis.* By relying on *Lopez–Martinez* and *Raftery,* the majority in this case compounds our court's error.

It is true, of course, that *Janis'* "zone of primary interest" test does limit the *Elkins* rule to some extent. That limitation, however, assumes *Elkins'* continuing applicability to cases such as ours. *Janis* found that the remoteness of federal civil tax proceedings from state criminal investigations, "coupled with the existing deter-

**1085**

rence effected by the denial of use of the evidence by either sovereign in the criminal trials with which the searching officer is concerned," justified not applying the exclusionary rule in such instances. *Janis,* 428 U.S. at 458, 96 S.Ct. 3021. That is, *Janis'* conclusion that deterrence concerns did not warrant applying the exclusionary rule to federal *civil* tax proceedings relied on the continued application of the exclusionary rule to *criminal* proceedings, whether state or federal. Far from adhering to *Janis,* our decisions in *Raftery, Lopez–Martinez, Basinger,* and this case erode the foundation on which *Janis* built the "zone of primary interest" test.

We have a responsibility to correct our deviations from Supreme Court precedent. The fact that our circuit has ignored *Janis* and *Elkins* over the course of many years does not lessen this responsibility.[2] We should hear this case en banc so we can overrule *Lopez–Martinez, Basinger,* and *Raftery* to the extent they conflict with *Janis* and *Elkins.*

## II.

Not only does the majority opinion flout Supreme Court precedent, it perpetuates an intra-circuit conflict as well. In *United States v. Perez–Castro,* 606 F.2d 251 (9th Cir.1979), a case decided before *Lopez–Martinez* and *Raftery* but cited by neither of them, this court held that evidence gained pursuant to an illegal search by local police was inadmissible in a subsequent federal trial. Citing *Elkins, Perez–*

*Castro* held that "[t]he Government may not successfully assert that the illegal act was done by state or local officers and therefore the statements subsequently taken are admissible in a federal prosecution, without concern as to the method by which they were obtained." *Id.* at 253. It is difficult to see how *Lopez–Martinez* and *Basinger* can be reconciled with *Perez–Castro.* Inasmuch as the latter is faithful to *Elkins* and *Janis,* this intra-circuit conflict highlights the extent to which *Lopez–Martinez* and *Basinger*—and, now, this case—have strayed from Supreme Court precedent.

The majority apparently finds no conflict between its holding and *Perez–Castro.* After finding no "showing of a connection or 'nexus' in time, place, or purpose between the searches and the subsequent prosecution" in this case, the majority cites *Perez–Castro* as an example of a case where there was such a showing. *See* Majority Opinion at 1082 & n.3. *Perez–Castro,* however, did not turn on a specific showing of a connection between local police activity and the subsequent federal prosecution. Indeed, *Perez–Castro* noted no such connection. Instead, the outcome in that case was dictated by the *Elkins* rule that the federal government may not avoid the exclusionary rule simply by "assert[ing] that the illegal act was done by state or local officers." *Perez–Castro,* 606 F.2d at 253. If we were to apply that rule here, the evidence Medina challenges would have to be suppressed. Thus, the majority's opin-

---

**2.** Today's majority opinion seems partially informed by a view that the exclusionary rule has lost favor with the Supreme Court of late, and that the views of the current Court are rather different from the views of the *Elkins* Court. Such considerations, even if correct, have no place in our decision-making. The Supreme Court has made it clear that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104

L.Ed.2d 526 (1989). It may be that "judges who must apply a body of decisional law that they have not themselves made, and which they lack final authority to change, may find it tempting to view their job as one of making predictions. They should resist the temptation because ... prediction ... undermines the rule of law by over-emphasizing the role of individual judges." Michael C. Dorf, *Prediction and the Rule of Law,* 42 UCLA L.Rev. 651, 715 (1995). The exclusionary rule continues to be mandated by Supreme Court precedent. We must not drain it of vitality on the suspicion that the current Supreme Court feels differently about the rule than did the Courts of past eras.

ion is irreconcilable with *Perez–Castro.* We should hear this case en banc to resolve this intra-circuit conflict.

### III.

·If we leave aside its disregard of Supreme Court precedent, the majority's application of the "zone of primary interest" test is flawed on its own terms.

First, it is sheer sophistry to suggest that state law enforcement officers have no interest in the conviction, in federal court, of suspects they have been pursuing, particularly where the suspect cannot be prosecuted in state court. As Justice Thomas recently noted on behalf of the Court, "[w]here the person conducting the search is a police officer, the officer's focus is not upon ensuring compliance with parole conditions or obtaining evidence for introduction at administrative proceedings, but upon *obtaining convictions of those who commit crimes.*" *Pennsylvania Bd. of Probation v. Scott*, 524· U.S. 357, 118 S.Ct. 2014, 2022, 141 L.Ed.2d 344 (1998) (emphasis added). Thus, while parole hearings, like civil tax proceedings, might fall outside state law enforcement officers' zone of primary interest, surely federal criminal prosecutions do not. The mind is not strained to imagine circumstances under which state law enforcement officers, realizing they have no state case against a suspect but hoping that a federal case might ultimately be brought, would perform illegal searches in the hope of obtaining evidence useful in a federal case. By not heeding the limits imposed by *Janis* on the "zone of primary interest" test, our court encourages such behavior.

Second, deterrence is not the only purpose served by the exclusionary rule. As *Elkins* emphasized, the exclusionary rule also serves "the imperative of judicial integrity." *Elkins*, 364 U.S. at 222, 80 S.Ct. 1437; *see Richmond Newspapers v. Virginia*, 448 U.S. 555, 594 n. 19, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) ("[T]he exclusionary rule is prompted not only by the accused's interest in vindicating his own rights, but

also in part by the independent imperative of judicial integrity." (quotation omitted)). The principle here is simple: the courts must not countenance violations of the Constitution: "In a government of laws, existence of the Government will be imperilled if it fails to observe the law scrupulously.... If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." *Olmstead v. United States*, 277· U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (Brandeis, J., dissenting). The integrity of the judiciary depends on its ability to protect against such risks. The exclusionary rule serves that end.

Our court has recognized the exclusionary rule's continuing importance as a safeguard of judicial integrity:

> [I]n addition to deterrence, the exclusionary rule serves the vital function of preserving judicial integrity.... [Where] the police unreasonably violate[ ] the defendant's fourth Amendment rights, the integrity of the courts [is] implicated. Federal courts cannot countenance deliberate violation of basic constitutional rights.

*Adamson v. C.I.R.*, 745 F.2d 541, 546 (9th Cir.1984); *see Gonzalez–Rivera v. INS*, 22 F.3d 1441, 1448–49 (9th Cir.1994) (quoting *Adamson* ); *see also Matta–Ballesteros v. Henman*, 896 F.2d 255, 262 (7th Cir.1990) ("the imperative of maintaining judicial integrity may play some role in the exclusionary rule calculus"). The admission of evidence in criminal proceedings without regard to the legality of the means by which· that evidence was acquired compromises the integrity of the judiciary.

As *Elkins* recognized, to a person subjected to an illegal search "it matters not whether his constitutional right has been invaded by a federal agent or by a state officer," for "[t]he Constitution is flouted equally in either case." 364 U.S. at 215, 80 S.Ct. 1437. Institutional distinctions between state and federal are cold comfort

for an individual facing criminal charges born of governmental lawlessness. We have long recognized that the pursuit of justice "must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954). Justice will appear to be done when we return to the Supreme Court's teaching in *Elkins* and *Janis*. Because today's opinion joins a line of cases straying from both the letter and the spirit of *Elkins* and *Janis*, I respectfully dissent.